**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

NATHAN FELTS,

    Plaintiff,

v.             No. 13-CV-1094 MCA/SCY

BOARD OF COUNTY COMMISSIONERS OF
VALENCIA COUNTY, VALENCIA COUNTY
SHERIFF'S DEPARTMENT, SHERIFF LOUIS
BURKHARD, DEPUTY SHERIFF DAVID HILL,
and DEPUTY SHERIFF JENNIFER MARTIN,

    Defendants.

## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** is before the Court on Defendants' Motion to Dismiss Plaintiff's First

Amended Complaint and for Qualified Immunity and Memorandum in Support Thereof [Doc. 18].

Having considered the parties' submissions, the relevant law, and otherwise being fully advised in

the premises, the Court grants the motion in part and denies the motion in part.

## BACKGROUND

  Plaintiff Nathan Felts filed suit in the Thirteenth Judicial District, County of Valencia,

State of New Mexico, on October 25, 2013, and Defendants removed the action to this Court on

November 9, 2011, pursuant to 28 U.S.C. Sections 1331 and 1441.  In his First Amended

Complaint ("Complaint"), Plaintiff alleges (1) 42 U.S.C. Section 1983 claims against Defendants

David Hill and Jennifer Martin for violation of his Fourth Amendment right to be free from

excessive police force, (2) Section 1983 municipal and supervisory liability claims against

Defendants Board of County Commissioners of Valencia County ("Valencia County"), Valencia

County Sheriff's Department ("VCSD"), and Valencia County Sheriff Louis Burkhard

1

("Burkhard") for failure to train and supervise in violation of Plaintiff's constitutional rights, (3) Section 1983 claims for violation of Plaintiff's right to substantive due process, (4) state law claims for assault, battery, and false arrest against Defendants Hill and Burkhard, and (5) statutory claims for violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"). [Doc. 12].

In support of these claims, Plaintiff alleges the following facts, which the Court construes in the light most favorable to Plaintiff. Plaintiff was diagnosed with bi-polar disorder on or around November 1, 2001, and the Social Security Administration has deemed him disabled for purposes of receiving disability benefits. [*Id.* ¶¶ 15, 80]. Plaintiff's disorder has caused him to have bouts of erratic behavior, suicidal ideation, and depression resulting in numerous psychiatric hospitalizations. [*Id.* ¶ 15].

On March 10, 2012, Plaintiff attended a family party at his father-in-law Christie Gurule's residence. [*Id.* ¶ 13]. As a result of his mental illness, Plaintiff's emotional state deteriorated over the course of the evening, his behavior became erratic, and he professed a desire to end his own life. [*Id.* ¶¶ 14, 81]. Plaintiff's family, and everyone attending the party, left the residence, but, because they were concerned for Plaintiff's safety, Plaintiff's father-in-law returned to the house, [*id.* ¶¶ 16, 17, 19], and Plaintiff's wife and sister called the police for assistance, [*id.* ¶ 17].

Defendant Martin knew Plaintiff by prior experience, knew that he was mentally ill, and had recently transported him to a mental facility for evaluation. [*Id.* ¶ 20]. Dispatch informed Defendants Hill and Martin that Plaintiff was suicidal, that Plaintiff suffered from bi-polar disorder, and that Plaintiff was threatening to blow up a house. [*Id.* ¶ 18]. Dispatch further notified Hill and Martin that Plaintiff was alone at the residence but that Gurule had decided to return to the residence because he was concerned about Plaintiff's safety. [*Id.* ¶ 19].

2

Defendant Martin arrived at Gurule's residence before midnight on March 10, 2012.   [*Id.* ¶ 21].   As the first officer on scene, Martin typically would have been the officer in charge and the officer who interacted with Plaintiff.   [*Id.* ¶ 23].   Martin, however, failed to act as lead officer in charge or to otherwise control the situation.   [*Id.* ¶ 45].

When Defendant Hill arrived at the residence just after midnight on March 11, 2012, Gurule met Hill at the front door, Hill inquired whether Plaintiff had any weapons, and Gurule informed Hill that Plaintiff had no firearms or weapons but that Plaintiff had a bat and would say that the bat was a shot gun.   [*Id.* ¶¶ 21, 25].   Immediately thereafter, without consulting Martin and without announcing his law-enforcement position or the purpose for his entry, Hill entered the residence and aggressively took over the scene.   [*Id.* ¶¶ 27, 24].   Defendant Martin failed to inform Hill about her previous encounter with Plaintiff.   [*Id.* ¶ 45].

Once Hill entered the residence, Plaintiff, who was obscured from Hill's view, yelled that he was holding a shot gun.   [*Id.* ¶ 28].   Plaintiff thereafter stepped from the bedroom doorway and became visible.   [*Id.* ¶ 29].   Ceiling fan lights illuminated the room and Hill and Martin were able to observe that Plaintiff was holding a baseball bat in front of him.   [*Id.* ¶ 30].   Hill, who was standing by the front door, was separated from Plaintiff by approximately twenty feet and a pool table was positioned between Hill and Plaintiff.   [*Id.* ¶ 29].

Defendant Hill twice yelled, "Drop it," while Plaintiff stepped forward but still remained outside of the distance at which Plaintiff could use the bat to strike anyone.   [*Id.*].   Hill thereafter discharged his firearm twice in rapid succession.   [*Id.*].   Hill's first shot entered Plaintiff's mouth and the bullet fragmented in contact with Plaintiff's teeth, tore off part of Plaintiff's tongue, and lodged into Plaintiff's cervical spine.   [*Id.* ¶ 31].   The second shot penetrated Plaintiff's left shoulder, collapsed one of Plaintiff's lungs, and lodged into Plaintiff's right rib cage.   [*Id.* ¶ 32].

3

Defendant Martin did not discharge her weapon.   [*Id.* ¶ 33].   Plaintiff was in deployable range of a taser at the time of his encounter with Defendants Hill and Martin.   [*Id.* ¶ 38].   Hill and Martin were equipped with tasers but did not use them.   [*Id.*].

The Complaint alleges that VCSD has long been aware that there is a high probability that its officers may come into contact with citizens who are displaying actions indicating that they are either mentally ill, delusional and disoriented, or otherwise incapacitated as a result of some disease or physical ailment.   [*Id.* ¶ 34].   The number of encounters with mentally-ill individuals placed VCSD and Burkhard on notice of the need for further training and the need to develop strategies, policies, procedures, and practices which would enable officers to implement proper methods for dealing with mentally-ill individuals and/or bringing these encounters to a close through arrest or transportation to a mental health facility.   [*Id.* ¶¶ 35, 36, 37, 56].

The Complaint further alleges that VCSD and Burkhard were responsible for the implementation and promulgation of official policies to maintain an effective law enforcement agency.   [*Id.* ¶ 55].   Although Valencia County and VCSD were on notice of the need for additional training, VCSD did not adopt any written guidance for its police officers on encounters with mentally-ill individuals and did not adequately train or staff VCSD with officers qualified to respond to mental health encounters.   [*Id.* ¶¶ 35, 36].

The Complaint also alleges that VCSD and Burkhard were deliberately indifferent to their responsibility to prepare supervisors to train officers how to interact with mentally-ill individuals without causing injuries.   [*Id.* ¶¶ 56, 57].   VCSD and Burkhard likewise were deliberately indifferent to the necessity of training and supervising personnel who could respond to the needs of mentally-ill individuals without causing great bodily harm or permanent injury.   [*Id.* ¶ 58].   Furthermore, Valencia County knew it was necessary to have personnel on call who were trained

to deal with situations such as the one involving Plaintiff, and yet Valencia County consciously ignored its responsibility to have such personnel on call.   [*Id.* ¶ 40].

The Complaint alleges that the failure of VCSD and Burkhard to train personnel to respond appropriately to mentally-ill individuals caused no one with proper training to be available to interact with Plaintiff.   [*Id.* ¶ 59].   Thus, at the encounter with Plaintiff, there were no sufficiently trained officers present, [*id.* ¶ 61], and the absence of proper training both caused Defendants Hill's and Martin's actions at the "scene [to be] inadequate for this specific situation," [*id.* ¶ 59], and caused the encounter to escalate, [*id.* ¶ 61].   "All of the actions taken at the scene in an attempt to subdue [Plaintiff] were contrary to established police methods for subduing the mentally ill" and this lapse "caused the officers on the scene to believe that they had no other option but to use excessive force on [Plaintiff].   In fact, had properly trained and supervised officers been on the scene, excessive force would not have been used."   [*Id.* ¶ 60].   VCSD and Burkhard's deliberate indifference to their responsibility to train and supervise officers to deal with recurring encounters with mentally-ill individuals caused great bodily harm and permanent injuries to Plaintiff.   [*Id.* ¶ 62].

## <u>STANDARD</u>

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable

inferences in the plaintiff's favor.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts which, if assumed to be true, state a claim to relief that is plausible on its face.  *See Twombly*, 550 U.S. at 570; *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).   Our Tenth Circuit has explained:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."   The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570)

(internal citations omitted).

Although qualified immunity is most often raised at the summary judgment stage, our Tenth Circuit has recognized the propriety of raising a qualified immunity defense in a motion to dismiss.   *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 645-46 (10th Cir. 1988); *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004).

Once a defendant raises the defense of qualified immunity in a Rule 12(b)(6) motion, the plaintiff must (1) come forward with allegations sufficient to show that the defendant's alleged actions violated a federal constitutional or statutory right and (2) show that the federal right was clearly established at the time of the challenged conduct.   *See Pueblo*, 847 F.2d at 646; *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010).   Our Tenth Circuit has held that "'the right [an officer is] alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:   The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).   The Circuit further has explained that for a right to be "particularized," there "ordinarily . . . must be a Supreme Court or Tenth Circuit opinion on point."   *Garramone v. Romo*, 94 F.3d 1446, 1451 (10th Cir. 1996).   Moreover, the Supreme Court has emphasized that a court must define the "right allegedly violated . . . at the appropriate level of specificity before [the] court can determine if it was clearly established."   *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citation omitted); *see Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (explaining that it is inappropriate for a court to define clearly established law at a high level of generality).   A district court must conclude that the right was clearly established "in light of the specific context of the case, not as a broad general

7

proposition." *Saucier*, 533 U.S. at 201.   "[T]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   *Id.* at 202.

A district court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson*, 555 U.S. at 236 (2009)).   If the plaintiff fails to satisfy his or her "heavy two-part burden," the court must grant the defendant qualified immunity and dismiss the deficient claims.   *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

<u>**DISCUSSION**</u>

Defendants move for dismissal with prejudice of all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).   First, Defendants argue that the Court should dismiss Plaintiff's 42 U.S.C. Section 1983 excessive force claims against Defendants Hill and Martin because Plaintiff has failed to alleged facts which state a constitutional violation of the Fourth Amendment and because Hill and Martin are entitled to qualified immunity.   Second, Defendants contend that the Court should dismiss Plaintiff's Section 1983 supervisory and municipal liability claims against Defendants Valencia County, VCSD, and Burkhard because Plaintiff has not alleged facts which state an underlying constitutional violation, VCSD is not subject to suit under Section 1983, and Plaintiff's allegations are conclusory and do not state a claim for relief.   Third, Defendants argue that the Court should dismiss Plaintiff's Section 1983 substantive due process claims because the Supreme Court has held that substantive due process claims are inappropriate where more specific protections are available under other constitutional amendments.   Fourth, Defendants maintain that the Court should dismiss Plaintiff's state tort claims of assault, battery,

and false imprisonment against Defendants Hill and Burkhard because Defendant Hill had probable cause to detain Plaintiff and this probable cause precludes Plaintiff's claims as a matter of law.   Fifth, Defendants contend that the Court should dismiss Plaintiff's ADA claims against the individual Defendants because individuals are not subject to suit under the ADA or Section 1983. Defendants further contend that the Court should dismiss Plaintiff's ADA claims against the municipal Defendants because Plaintiff has not alleged facts which establish that the municipality denied him a public benefit because of his disability.   The Court addresses each of Defendants' contentions in turn.

I.      Plaintiff Has Stated a Section 1983 Claim for Violation of his Fourth Amendment Right to be Free from Excessive Force Against Defendant Hill but not Defendant Martin.

Plaintiff brings Section 1983 claims against Defendants Hill and Martin for violation of his Fourth Amendment right to be free from excessive force.   Section 1983 provides civil redress for deprivation of constitutional rights by persons acting under color of state law. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995); 42 U.S.C. § 1983.   "Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them."   *Wilson*, 52 F.3d at 1552 (citation omitted); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).   Defendants Hill and Martin argue that Plaintiff has not stated a viable Section 1983 excessive force claim because Plaintiff has not alleged facts which state a constitutional violation, and that, even if he had alleged such facts, they nonetheless are entitled to qualified immunity from Plaintiff's claims.

The Court concludes that Plaintiff has alleged facts sufficient to state an excessive force claim against Defendant Hill and to overcome Hill's assertion of qualified immunity.   Plaintiff, however, has failed to allege facts sufficient to overcome Defendant Martin's assertion of qualified immunity.   Thus, the Court grants Defendants' motion to dismiss Plaintiff's Section

1983 excessive force claim against Martin but denies their motion to dismiss Plaintiff's Section 1983 excessive force claim against Hill.

      A.    <u>Plaintiff has not Overcome Defendant Martin's Assertion of Qualified Immunity</u>.

Defendant Martin maintains that Plaintiff has not alleged any facts to support a claim of excessive force against her because Plaintiff failed to allege that Martin exercised any force at all. Martin further contends that, even if the Court were to conclude that Plaintiff has alleged facts which state a constitutional violation, Martin nonetheless is entitled to qualified immunity because it was not clearly established in our Tenth Circuit that Martin's actions violated Plaintiff's constitutional rights.

In response to Martin's first argument, Plaintiff maintains that an officer who has the opportunity to prevent a fellow officer from using excessive force, but fails to do so, is liable under Section 1983 as a tacit collaborator for the fellow officer's use of unlawful force.   [Doc. 21 at 6]. In *Mick v. Brewer*, our Tenth Circuit confirmed that it is clearly established in this Circuit that a law enforcement official who fails to prevent another law enforcement officer's use of excessive force may be liable under Section 1983.  *See* 76 F.3d 1127, 1136 (10th Cir. 1996) (citations omitted).   The Circuit held in *Mick* that the district court erred when it dismissed the plaintiff's Section 1983 claim against an officer witnessing, but not personally inflicting, excessive force against the plaintiff, because the plaintiff presented evidence that the observing officer had time to prevent the use of excessive force but failed to intervene.   *See id*.   Likewise, in *Lusby v. T.G. & Y. Stores, Inc.*, our Tenth Circuit held that the district court properly denied a defendant-officer's motion for a directed verdict on a Section 1983 excessive force claim because the plaintiff presented evidence that a police officer who observed his fellow officer utilize excessive force against the plaintiff could have prevented the assaulting officer's attack on the plaintiff but failed

10

to do so.  *See* 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated on other grounds*, 474 U.S. 805 (1985).

The Court holds that the Complaint does not allege facts which establish that Martin violated Plaintiff's right to be free from excessive police force.  *Cf. Garramone*, 94 F.3d at 1449 (explaining that once a defendant raises the defense of qualified immunity in a motion to dismiss, a plaintiff is required to (1) point to facts alleged which, if true, constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established such that a reasonable person in [the officer's] position would have known that [the] conduct violated the right") (citations omitted).

An observing officer who "had the opportunity to intervene but failed to do so" can be held liable as a tacit collaborator for a fellow officer's use of excessive force is in our Tenth Circuit. *Lusby*, 749 F.2d at 1433; *see also Mick,* 76 F.3d at 1136.  Here, however, the facts alleged by plaintiff make it clear that Martin did not have the "opportunity to intervene" to stop Hill's unconstitutional use of force.  *Lusby*, 749 F.2d at 1433.  Plaintiff concedes that "Deputy Hill went without pause from his vehicle to the front door, was told about the bat by Christie Gurule, told [Plaintiff] to drop it (or show me your hands), and shot [Plaintiff] twice, <u>all in the matter of seconds not minutes</u>."   [Doc. 21 at 6 (emphasis in original)].   Moreover, the facts in the Complaint allege that, after being met at the door by Plaintiff's father-in-law Gurule, Hill "[i]mmediately thereafter . . . entered the residence," Plaintiff yelled that he had a shot gun and stepped from a bedroom doorway, Hill twice yelled, "Drop it," while Plaintiff stepped forward, and Hill shot twice in rapid succession.   [Doc. 12, ¶¶ 25, 27, 30].   Plaintiff has not alleged facts or presented argument establishing how, during this brief sequence of events, Martin could have prevented Hill from firing his weapon.   Plaintiff fails, for example, to allege where Martin was

positioned in relation to Hill and whether Martin was in sufficiently close physical proximity to prevent Hill from discharging his weapon.

The Court's holding is supported by *Lusby* and *Mick*.   In *Lusby*, the plaintiff specifically presented evidence that the observing officer could have stopped his fellow officer's use of unreasonable force but that the officer nonetheless failed to come to the plaintiff's aid.   *See* 749 F.2d at 1433.   Likewise, in *Mick* the plaintiff presented an eye witness affidavit indicating that the observing officer watched his fellow officer attack the plaintiff, had time to intervene, and yet did nothing to prevent the use of excessive force.   *See* 76 F.3d at 1136-37.   Thus, in both *Lusby* and *Mick*, the observing officers who faced Section 1983 liability as tacit collaborators had the opportunity to prevent the use of force but failed to do so.   The facts alleged by Plaintiff do not suggest that a reasonable officer in Defendant Martin's position would have had sufficient time to prevent Hill's use of force.   The facts of *Lusby* and *Mick*, therefore, are distinguishable from those here.[1]

Further, as to the second prong of qualified immunity, the Court concludes that the law of our Circuit would not put a reasonable officer on notice that his or her conduct violated the rights of an individual where the officer failed to intervene to stop a constitutional violation by another officer even though the first officer had no opportunity to intervene.   *Lusby* and *Mick*, as discussed above, relied in part on the opportunity for the officer to intervene in concluding there was a constitutional violation by a non-intervening officer.   *Lusby*, 749 F.2d at 1433; *Mick*, 76 F.3d at 1136-37.   Accordingly, these decisions could not place Martin on notice that her conduct

---

[1]   *Compare O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (refusing to hold an officer present during a fellow officer's use of excessive force liable as a tacit collaborator because the observing officer "had no realistic opportunity" to attempt to prevent "blows . . . struck in such rapid succession").

violated Plaintiff's constitutional rights.   S*ee Brosseau*, 543 U.S. at 198-99 (emphasizing that, in conducting the clearly established inquiry, it is inappropriate for a district court to define clearly established law at a high level of generality); *Saucier*, 533 U.S. at 201 (stating that a district court must make its conclusion "in light of the specific context of the case, not as a broad general proposition").   Ultimately, "the relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   *Id.* at 202.   The Court concludes that it would not have been clear to Martin that her conduct was unlawful in the situation she confronted.

Plaintiff argues that Martin could have prevented Hill's use of excessive force during the moments leading up to the shooting, not by physically intervening and restraining Hill from firing his weapon, but rather by using indirect preventative measures.   Plaintiff argues that Martin could have:   retained control over the situation; retreated herself and encouraged Hill to retreat; used her taser before Hill could discharge his weapon; informed Hill that she had had a prior encounter with Plaintiff and was successfully able to transport Plaintiff to a mental health facility; or otherwise ensured that Hill diffuse instead of escalate the situation.   [Doc. 21, pp. 5-7]   However, Plaintiff fails to allege facts which would establish that Martin knew or should have known that Hill would shoot Plaintiff.   Thus, Plaintiff's allegations do not establish that Martin had the opportunity to intervene.   Nor do they establish that a reasonable officer in Martin's position would have known that her conduct of failing to take these prophylactic steps before Hill discharged his weapon violated Plaintiff's Fourth Amendment right to be free from excessive police force.   Neither *Lusby* nor *Mick* suggest that an officer witnessing a fellow officer's use of excessive force is required—in the absence of evidence suggesting that the fellow officer is likely to use excessive force— to anticipate the need to take preventative steps that could prevent the escalation of an

13

encounter with a subject and ultimately prevent the fellow officer's use of force.

Accordingly, the Court holds that Plaintiff neither stated a claim for a violation of his rights by Martin nor established that a reasonable officer in Martin's position would have known that her failure to prevent Hill from discharging his weapon or that her failure to undertake preventative measures would violate Plaintiff's constitutional rights.   Thus, the Court holds that Defendant Martin is shielded by qualified immunity from Plaintiff's Section 1983 excessive force claim against her.   Accordingly, the Court grants Defendant Martin's motion to dismiss Plaintiff's Section 1983 excessive force claim.

B.      Plaintiff has Stated a Section 1983 Excessive Force Claim Against Defendant Hill and has Overcome Hill's Assertion of Qualified Immunity.

Defendant Hill contends that Plaintiff has failed to state a constitutional violation of his right to be free from excessive force.   Defendant Hill further argues that, even if the Court were to conclude that Plaintiff has alleged facts which state a constitutional violation, Hill nonetheless is entitled to qualified immunity from Plaintiff's excessive force claim because it was not clearly established in our Tenth Circuit that Hill's actions violated Plaintiff's constitutional rights.   The Court first examines whether Plaintiff has alleged facts which state a constitutional violation and next determines whether Plaintiff has satisfied his qualified immunity burden.

1.      The Facts Alleged State a Constitutional Excessive Force Violation.

In *Graham*, the Supreme Court held that an officer's use of excessive force during arrest violates a person's Fourth Amendment right against unreasonable search and seizure, and that all excessive force claims should be analyzed under the reasonableness standard of the Fourth Amendment.   *See* 490 U.S. at 395.   The Fourth Amendment reasonableness inquiry is objective and heavily fact dependent. *See, e.g., Wilson*, 52 F.3d at 1553.   It also recognizes that the

14

"'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, . . . [and it] must embody allowance for the fact that police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . [,] violates the Fourth Amendment." *Id.* at 396.   A court must pay careful attention to the totality of the facts and circumstances of each particular case, including but not limited to the severity of the crime at issue, whether the subject posed an immediate threat to the safety of the officer, and whether the subject was actively resisting arrest or attempting to evade arrest by flight. *See id.* (citation omitted).

The undisputed facts alleged in the Complaint establish that the three *Graham* factors weigh in favor of stating a constitutional violation.   Plaintiff contends that, in regards to the first factor, the severity of the crime at issue, the officers were responding to a non-criminal situation involving a mentally-ill and suicidal individual.[2]   Defendants argue, however, that a severe crime was at issue, because the Complaint alleges that dispatch informed Defendants Hill and Martin that Plaintiff was threatening to blow up his father-in-law's residence.

Defendants have not identified what specific crime Hill believed Plaintiff was committing, what the elements of that crime are, and which allegations in the Complaint support each element of the crime.   Defendants also have failed to present any argument why the crime was sufficiently severe to weigh against stating a constitutional violation.   Furthermore, to the extent Defendants contend that Plaintiff's threat to "blow up" the house was criminal, the facts construed in

---

[2]   In New Mexico, suicide is not a crime.   *See Harrell v. City of Belen*, 603 P.2d 722, 727 (N.M. Ct. App.), *rev'd on other grounds*, 603 P.2d 711 (N.M. 1979).

Plaintiff's favor do not establish that Plaintiff took any overt step in furtherance of the commission of a crime.

Consistent with its obligation to view the allegations in the Complaint in the light most favorable to Plaintiff and to draw all reasonable inferences in Plaintiff's favor, *see Tellabs, Inc.*, 551 U.S. at 322; *Smith*, 561 F.3d at 1098, the Court holds that the allegations do not establish that a relatively severe crime was at issue.   Rather, the allegations establish that the officers were aware that Plaintiff had a mental illness, that Plaintiff was threatening to commit suicide, and that Plaintiff's family called the police because they were concerned for his safety.   Although Plaintiff alleges that Hill and Martin were aware that Plaintiff had threatened to "blow up" the house, the facts do not establish that Hill was aware of any facts suggesting that Plaintiff had taken an overt step toward the commission of a crime or that Hill perceived Plaintiff to be a risk to safety because of his threat.   Thus, the facts construed in Plaintiff's favor suggest that the officers were responding to a mental health crisis involving a threat of suicide, which is not a crime, *see supra* note 2, and that they were not responding to the commission of any crime.

The second *Graham* factor, whether Plaintiff posed an immediate threat to safety, also weighs in favor of stating a constitutional violation.   The facts alleged do not suggest that Plaintiff posed an immediate threat to the safety of the officers or of Gurule sufficient to justify the use of deadly force.   Defendants maintain that "Plaintiff had a weapon in his hands which he claimed was a firearm" and "the weapon . . . was the same shape and size of the firearm he claimed he was holding."   [Doc. 18 at 6].   The facts alleged by Plaintiff, however, construed in the light most favorable to Plaintiff, *cf. Tellabs*, 551 U.S. at 322, indicate that Gurule informed Hill Plaintiff would claim he was holding a shot gun, that Plaintiff actually was holding a bat, and that "it was clearly visible" to the officers that Plaintiff was holding a baseball bat and not a shotgun.   [Doc.

12 ¶ 30]. Thus, it is of no consequence that a baseball bat is the same shape and size as a shotgun or that Plaintiff claimed he was holding a shotgun.

Defendants next contend, "Whether [the] weapon [Plaintiff was holding] was perceived by the officers to be a shotgun, as Plaintiff himself agrees he declared, or a baseball bat, is hardly material, given that either is potentially a deadly weapon depending on how it is deployed." [Doc. 24 at 4]. The Court is not persuaded. The threat posed by a suspect holding a shotgun at a distance of twenty feet is far greater than the threat posed by a suspect holding a bat at a distance of twenty feet. A shotgun is specifically designed to inflict deadly harm at a distance of twenty feet whereas a bat is not. Thus, the Court does not agree that a baseball bat poses the same deadly threat as a firearm. This is particularly true because the facts alleged do not establish that Plaintiff made any attempt to "deploy" the bat as a potentially deadly weapon. The Complaint alleges that Plaintiff claimed the bat to be a shotgun. The Court cannot conclude that a reasonable officer would have believed that Plaintiff, wielding a bat he claimed to be a shotgun, would utilize the would-be "shotgun" as a bat and swing it to inflict deadly injury. Rather, the facts construed in Plaintiff's favor suggest that the only manner in which Plaintiff would deploy the bat would be to "fire" it as one would fire a shotgun.

The Court likewise is not persuaded by Defendants' argument that it is "irrelevant" that "Plaintiff may have been 'still outside the distance in which a bat could be used to strike either of the police officers,'" [*id.* (citing Doc. 12 ¶ 30)], because "[b]y Plaintiff's own allegations, he had stepped out of a bedroom door that was 'approximately 20 feet from the front door,' and then 'stepped forward' again with his weapon, after being directed to drop it." [*Id.* (citing Doc. 12 ¶¶ 29-30)]. Defendants claim, "After all, twenty feet is practically no distance at all, and could be covered in seconds." [*Id.* at 5]. Admittedly, a distance of twenty feet may be "no distance at all"

17

when the weapon is a shotgun, but it is a sufficient distance when the weapon is a bat to negate the immediacy of any threat, even if the suspect takes a step forward.   This is particularly true where the suspect and third parties are separated by a large impediment (*i.e.*, a pool table), the suspect is not wielding the bat as if to swing or throw it (and, indeed, the suspect may not be likely to do so because he claims the bat is a shotgun), the suspect is not moving rapidly towards the officers, the suspect is not attempting to flee the scene, and the officers know the suspect is mentally ill and intending to use the bat he believes to be a shotgun to inflict injury upon himself.   Moreover, even though Plaintiff had threatened to "blow up" the residence, which could have resulted in harm to third parties, the facts do not establish that there was any immediate—or even any real—risk of Plaintiff doing so, and Defendants themselves do not even argue that Hill exercised force in response to a belief, reasonable or otherwise, that Plaintiff posed a risk to safety because of his threat to the residence.

Thus, for all of these reasons, the Court cannot conclude, when construing the facts alleged in the Complaint in the light most favorable to Plaintiff, that a reasonable officer in Hill's position would have believed that Plaintiff posed an immediate threat to the officers or to Gurule sufficient to justify Hill's use of deadly force.   Accordingly, the second *Graham* factor weighs in favor of stating a constitutional violation.

The Court further concludes that the third *Graham* factor, whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight, also weighs in favor of stating an excessive force claim.   Plaintiff has not alleged facts indicating that he actively was resisting arrest or that he was attempting to evade arrest by flight from the scene.   The facts do not suggest that Plaintiff resisted the officers in any way other than by failing to drop the bat within the seconds after Defendant Hill twice commanded Plaintiff to do so.   This fact alone, construed in Plaintiff's

18

favor, does not rise to the level of actively resisting arrest.   Thus, the third *Graham* factor also weighs in Plaintiff's favor.

On the facts alleged, all of the *Graham* factors weigh in favor of stating a constitutional violation.   A reasonable officer, on these facts, would not have believed that it was appropriate to shoot Plaintiff twice in rapid succession when Plaintiff was not committing any relatively severe crime, did not present an immediate threat to safety, and was not actively resisting arrest or attempting to evade arrest by fleeing the scene.   The Court therefore denies Defendant Hill's motion to dismiss Plaintiff's Section 1983 excessive force claim to the extent Hill moves for dismissal on the ground that Plaintiff failed to allege facts which state a constitutional violation.

2.      The Law was Clearly Established and a Reasonable Officer in Hill's Position would have Known that his Conduct Violated Plaintiff's Rights.

The Court also denies Defendant Hill's motion to dismiss Plaintiff's Section 1983 excessive force claim to the extent Hill moves for dismissal on the ground that he is shielded by qualified immunity.   Because Defendant Hill raises the defense of qualified immunity, Plaintiff both must point to facts alleged which, if true, constitute a violation of a constitutional right, and must demonstrate that the "right was clearly established at the time such that a reasonable person in the [Hill's] position would have known that [his] conduct violated the right."   *Garramone,* 94 F.3d at 1449 (citations omitted); *see, e.g.*, *Saucier*, 533 U.S. at 201-02.

Having already concluded that the facts alleged by Plaintiff state a constitutional excessive force violation, the Court turns to the second prong of the qualified immunity inquiry and holds that it was clearly established at the time of Plaintiff's encounter with Hill that an officer violates the law when he uses deadly force against a suspect who is not committing a crime, does not pose an immediate—or indeed any—threat to officer or third-party safety, and is not resisting arrest or

19

attempting to flee the scene.  *Cf. Graham*, 490 U.S. at 396-97.  Thus, a reasonable officer in Hill's position would have known that shooting Plaintiff in the mouth and again in the shoulder, under the non-threatening circumstances Hill faced, violated Plaintiff's right to be free from excessive force.  Furthermore, the unlawfulness of Hill's conduct would have been apparent in light of preexisting Tenth Circuit and Supreme Court law.  *See Walker v. City of Orem*, 451 F.3d 1139, 1160 (2006) (concluding that officers used excessive force against suicidal man holding a knife to his own wrist, about 21 feet away from the nearest officer, not advancing on officers or threatening anyone, and holding that it was well established that the use of deadly force under such circumstances would be unconstitutional); *Cf. Graham*, 490 U.S. at 396-97.  Plaintiff, therefore, has satisfied his qualified immunity burden.  Accordingly, the Court denies Defendant Hill's motion to dismiss Plaintiff's Section 1983 excessive force claim.

II.     Plaintiff has Stated Viable Section 1983 Claims for Supervisory or Municipal Liability.

Defendants Valencia County, VCSD, and Burkhard contend that the Court should dismiss Plaintiff's Section 1983 supervisory and municipal liability claims against them because (1) Plaintiff has not alleged facts indicating that Hill or Martin committed a constitutional violation; (2) VCSD is a sub-unit of Valencia County and therefore is not subject to suit under Section 1983; (3) Plaintiff has not alleged facts which indicate that Burkhard in his individual capacity engaged in any act that violated Plaintiff's constitutional rights or that Burkhard was otherwise liable in his capacity as a supervisor; and (4) Plaintiff has not alleged plausible facts which state a municipal liability claim against Valencia County or Burkhard in his official capacity.

Although the Court rejects Defendants' first, third and fourth arguments, it finds Defendants' second argument persuasive.  The Court therefore dismisses Plaintiff's Section 1983

claim against VCSD but does not dismiss Plaintiff's Section 1983 claims against Burkhard and Valencia County.

      A.    <u>Plaintiff has not Stated a Claim Against VCSD</u>.

Defendants argue that Plaintiff cannot state a Section 1983 claim against VCSD "as a matter of law because governmental sub-units are not properly suable entities in § 1983 actions." [Doc. 18 at 1 n.1]. In support of this claim, Defendants cite our Tenth Circuit's decision in *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985), in which the court held that the "'City of Denver Police Department' is not a separate suable entity, and the complaint will be dismissed as to it." *Id.* Valencia County is an entity subject to Section 1983 suit. VCSD, however, is only a sub-unit of Valencia County and therefore is not a separate and distinct entity from Valencia County subject to Section 1983 suit. Thus, while Valencia County is a proper party to Plaintiff's Section 1983 suit, Valencia County's sub-unit VCSD is not. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's Section 1983 claims against VCSD.

      B.    <u>Plaintiff Has not Stated a Claim Against Burkhard or Valencia County</u>.

Section 1983 does not authorize either strict or respondeat superior liability. *See Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010) (quoting 42 U.S.C. § 1983) (explaining that the "plain language of [Section 1983] asks simply whether the defendant at issue 'subject[ed], or cause[d] to be subjected' a plaintiff to a deprivation of his legal rights" and that the statute by its terms does not authorize either strict liability or respondeat superior liability). Therefore, to state a supervisory or municipal liability Section 1983 claim, Plaintiff must allege facts which establish that Valencia County itself, and Burkhard himself, engaged in culpable conduct.

To state a violation of Section 1983 by a supervisor, such as Burkhard in his individual capacity, "'[a] plaintiff must establish a deliberate, intentional act' on the part of the [the

supervisor] 'to violate [the plaintiff's legal] rights.'"   *Id.* at 1327-28 (quoting *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006)).   To state a Section 1983 claim against a municipality, such as Valencia County or Burkhard in his official capacity, a plaintiff must identify an "official policy" that was the "moving force" behind the alleged injury to "make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

Defendants' motion to dismiss Plaintiff's supervisory and municipal liability claims focuses on the inadequacy of Plaintiff's allegations regarding Valencia County's and Burkhard's failure to train its officers.   A failure to train is a viable basis for Section 1983 supervisory or municipal liability.[3]   Defendants contend that Plaintiff has not stated a supervisory liability claim against Burkhard in his individual capacity, or a municipal liability claim against Valencia County or Burkhard in his official capacity, because Plaintiff's allegations that Burkhard and Valencia County failed adequately to train Defendant Hill are conclusory and conflicting.   According to Defendants, "Plaintiff's own allegations establish that Deputy Martin had successfully dealt with another 'mental health crisis' of Plaintiff's in the past . . . , so obviously her training was sufficient on its face."   [Doc. 18 at 8].   The Court first addresses the merits of Defendants' contentions regarding Plaintiff's supervisory liability claim and thereafter addresses Defendants' arguments regarding Plaintiff's municipal liability claim.

1. Plaintiff's Allegations State a Plausible Section 1983 Supervisory Liability Claim Against Burkhard in his Individual Capacity.

---

[3]   *See Dodds v. Richardson*, 614 F.3d 1185, 1212 (10th Cir. 2010) (Tymkovich, J., concurring) (explaining that supervisory liability can be premised upon a failure to train theory); *Sanchez v. Melendrez*, 934 F. Supp. 2d 1325, 1343 (10th Cir. 2013) (noting that "'supervisory shortcomings'" include a failure to train) (quoting *Dodds*, 614 F.3d at 1212); *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997) (explaining that municipal liability can be premised on a failure to train theory), *cert. denied*, 528 U.S. 1148 (1998).

In *Dodds v. Richardson*, our Tenth Circuit addressed Section 1983 supervisory liability in the aftermath of the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).   *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 2150 (2011).   The *Dodds* court explained that prior to *Iqbal*, a plaintiff alleging supervisory liability "first had to establish 'the supervisor's subordinates violated the [C]onstitution,'" and "[t]hen, [had to] demonstrate 'an affirmative link' between the supervisor and the violation.'"   *Id.* at 1195 (quoting *Serna*, 455 F.3d at 1151).

> Over time, this "affirmative link" requirement came to have three related prongs:   (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind.   A plaintiff could establish the defendant-supervisor's personal involvement by demonstrating his "'personal participation, his exercise of control or direction, or his failure to supervise,'" . . . or his "knowledge of the violation and acquiesce[nce] in its continuance."

*Id.* (quoting *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) and *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)).   "A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement."   *Id.* (citing *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988)).   Next, "[a] plaintiff . . . had to establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"   *Id.* at 1195-96 (quoting *Poolaw*, 565 F.3d at 732-33).   Finally, "the plaintiff also had to show the supervisor had a culpable state of mind, meaning 'the supervisor acted knowingly or with deliberate indifference that a constitutional violation would occur.'"   *Id.* at 1196 (quoting *Serna*, 455 F.3d at 1151, 1154).

The *Dodds* court explained that consensus as to the implications of *Iqbal* is "elusive" and acknowledged that *Iqbal* "may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit." *Id.* at 1200.  The court, concluded, however, that the case before it did not require it to resolve the extent of *Iqbal's* impact.  *See id*.  The court therefore held only that,

> [w]hatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case:  § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution."

*Id.* at 1199 (quoting 42 U.S.C. § 1983).  Thus, under *Dodds*, a plaintiff may succeed in a Section 1983 suit against a defendant-supervisor by showing that (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.  *See id.* at 1199-1200 (citations omitted).

The *Dodds* court also concluded that "we do not believe [*Iqbal*] altered the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  *Id.* at 1200. Thus, even after *Iqbal*, the pre-*Iqbal* bases for establishing personal involvement—*i.e.*, personal participation, the exercise of control or direction, the failure to supervise, or acquiescence in a continued violation, in addition to the establishment of a policy or custom—are still viable methods of stating a constitutional violation by a supervisor, and the pre-*Iqbal* law regarding causation also is applicable.  *See id.* at 1200 (explaining that *Iqbal* did not alter personal involvement analysis); *id.* at 1199 (in the context of describing precisely what theory of

supervisory liability survives *Iqbal*, citing *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1263-64 (D. Colo. 2010), for the proposition that it is not only personal participation by a supervisor or the exercise of control or direction by the supervisor that can support a post-*Iqbal* claim, but also the establishment of an unconstitutional policy or custom).   *Iqbal*, however, now, at a minimum, also requires a plaintiff to allege that the supervisor acted "with the state of mind required to establish the alleged constitutional deprivation."   *Id.* at 1199-1200.

It is clear that even post-*Iqbal*, "[r]egardless of what theory is asserted for supervisory liability, a supervisor 'is only liable for his or her own misconduct.'"   *Id.* at 1212 (quoting *Iqbal*, 129 S. Ct. at 1949); *accord Rocha v. Twilleger*, No. 10-CV-00357-CMA-MEH, 2011 WL 2174428 (D. Colo. June 3, 2011).   Thus, Plaintiff's supervisory liability claim against Defendant Burkhard in his individual capacity, which is premised upon a failure to train theory, must plead "sufficient facts to adequately allege personal participation on behalf of [Burkhard]."   *Id.* at *2.

The Court concludes that Plaintiff has stated a claim for Sheriff Burkhard's individual liability.4   Plaintiff alleged that Sheriff Burkhard "was responsible for the implementations (*sic*) and promulgation of official policies for the Department to maintain an effective law enforcement agency capable and prepared to deal with encounters such as that which occurred in this case." [Doc. 12 ¶ 55].   Plaintiff further alleges that Sheriff Burkhard "knew or should have known that encounters with the mentally ill are common and its officers would need to be capable of advising and implementing proper methods for encounters, detention and arrests with the mentally ill."

---

4 Defendant argues, correctly, that it is not clear from the Complaint whether Plaintiff is suing Burkhard in his official or individual capacity (or both).   [Doc. 18, p. 1, n.1]   Plaintiff does not address this issue in his response brief.   [Doc. 21]   Reading the Complaint in the light most favorable to Plaintiff, as this Court must, the Court reads Plaintiff's Complaint to state a claim against Burkhard in both his official and supervisory capacities.   Defendants have not moved to dismiss on the grounds of qualified immunity as to Burkhard [Doc. 18], and thus the Court does not address the issue.

[Doc. 12, ¶ 57]. Plaintiff alleges that Sheriff Burkhard was "deliberately indifferent to the necessity of training and supervising personnel who could respond to the needs of mentally ill and delusional and disoriented citizens in order to prevent great bodily harm or permanent injury." [Doc. 12, ¶ 58]. The Court concludes that these allegations are neither conclusory nor implausible. It is "plausible on its face" that the Sheriff was the individual within VCSD responsible for determining what training was or was not necessary for his officers with regard to encounters with the mentally ill. *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *Brown*, 227 F.3d at 1289 (recognizing that the policy maker, with regard to police department training decisions, "could be the chief of police"). Here, the allegations state a claim that Sheriff Burkhard was personally involved in the failure to train, and thus the affirmative link necessary to plead his liability exists. *See Wilson v. Montano*, 715 F.3d 847, 858 (10th Cir. 2013) (holding that allegations were sufficient to state a claim against sheriff for policy or custom of arresting and detaining citizens without charges ever being filed); *c.f. Poolaw*, 565 F.3d at 733 ("[A] defendant may be liable if a plaintiff can show that an affirmative link exists between the [constitutional] deprivation and either the [officer's] personal participation, his exercise of control or direction, or his failure to supervise." (internal quotation marks and citations omitted)). Thus, the Court concludes that Plaintiff has sufficiently pleaded personal involvement by Sheriff Burkhard. In this regard, the Court recognizes that there is a dearth of case law from our Circuit, post-*Iqbal*, to guide the Court in determining the personal involvement issue. *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 768 (10th Cir. 2013) (stating that its post-*Iqbal* cases have not "presented us with the occasion to address the precise contours of [the personal involvement] standard").

26

Plaintiff has also alleged sufficient facts to establish a causal connection between the lack of training concerning encounters with mentally ill individuals and the shooting of Plaintiff. Plaintiff alleges:

> 59.   Due to the lack of seriousness of VCSD and Sheriff Burkhard to engage and train personnel in sufficient numbers to respond appropriately within Valencia County on March 10-11, 2012, there was no one available with training on dealing with individuals such as plaintiff.   The actions taken by the officers on the scene were inadequate for this specific situation due to the absence of adequately trained supervisory officers to deal with the mentally ill or delusional and disoriented subjects.
>
> 60.   All the actions taken at the scene in an attempt to subdue Nathan Felts were contrary to established police methods for subduing the mentally ill, delusional and disoriented[, and] as such caused the officers on the scene to believe that they had no other option but to use excessive force of Felts.   In fact, had properly trained and supervised officers been on the scene, excessive force would not have been used.
>
> 61.   At the scene of the encounter with Nathan Felts, there were no sufficiently trained officers available to deal with Plaintiff.   Every action taken by the insufficiently trained police officers was inappropriate for the situation and caused the encounter to be escalated.

[Doc. 12].   The Court concludes that these allegations are sufficient to establish a causal connection.   In order to establish a causal link "the identified deficiency in [the] training program must be closely related to the ultimate injury, so that it actually caused the constitutional violation."   *Brown*, 227 F.3d at 1290 (internal quotation marks and citation omitted).   These allegations state a direct link between the insufficient training on dealing with mentally ill individuals, and the actions taken by the officers, which "escalated" the situation, resulting in Officer Hill shooting Plaintiff seconds after shouting at him, rather than subduing Plaintiff.   *See id.* at 1290-91 (concluding that there was evidence of a direct causal link between a lack of training on arresting individuals while off-duty and the officer shooting a citizen while attempting to effectuate an off-duty arrest).

Finally, the Court concludes that Plaintiff has stated a claim that Sheriff Burkhard had a

sufficiently culpable state of mind: deliberate indifference.  To plead deliberate indifference, a plaintiff must allege that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers . . . can reasonably be said to have been deliberately indifferent to the need."  *Brown*, 227 F.3d at 1288 (internal quotation marks and citation omitted).  A plaintiff need not prove "the existence of a pervasive problem[, nor] . . . that the chief of police was personally aware of and chose to ignore the problem."  *Id.* at 1289.  Instead, the plaintiff must establish that the policy maker was "deliberately indifferent to the risks posed by the inadequate training."  *Id.*  Here, Plaintiff alleges that the Sheriff "knew or should have known that encounters with the mentally ill are common and its officers would need to be capable of advising and implementing proper methods for encounters, detention and arrest with the mentally ill."  [Doc. 12, ¶ 57]  Plaintiff alleges that there were no "standard operating procedures or written guidance for its police officers on how to deal with mentally ill, delusional or disoriented individuals[,]" and there was inadequate training on responding to calls involving mental health issues, delusional citizens, and "possibly suicidal individuals."  [Doc. 12, ¶¶ 35, 36]  Finally, Plaintiff alleges that Sheriff Burkhard was deliberately indifferent to the need for him to train his deputies and supervisors with regard to encountering, arresting and detaining mentally ill individuals without causing them injuries. [Doc. 12, ¶ 56]  These allegations state a claim that Sheriff Burkhard was deliberately indifferent, in that he had knowledge that his officers would commonly encounter the mentally ill, that there were risks posed by the lack of training of his personnel, and that he nonetheless failed to train his employees regarding the constitutional rights of the mentally ill during such encounters.  *See Steward v. City of Prairie Village*, 904 F.Supp.2d 1143, 1162 (D.Kan. 2012) (holding that the plaintiff sufficiently pleaded deliberate indifference based on a lack of training and supervision of

its officers, and in which the parties (and court) agreed that encounters with agitated and threatening mental ill individuals are a "usual and recurring situation with which officers must deal").

The Court notes that it is reviewing this case at the stage of a motion to dismiss, and not on summary judgment.   *Iqbal* addresses the type of allegations necessary to state a claim of personal involvement, but, as *Dodds* recognized, it did not "alter[] the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."   *Dodds*, 614 F.3d at 1200. Here, the Court concludes that the Plaintiff has sufficiently pleaded his claim, and thus is entitled to discovery to flesh out evidence on the elements he must prove.   To read *Iqbal* as requiring more than has been pleaded in this case would put any plaintiff between the proverbial rock and hard place:   without discovery the plaintiff cannot learn, and therefore allege, more detailed facts about what the policy actually is, who was responsible for creating the policy, and what those decision-makers knew when promulgating the policy.   Clearly this information, in most cases, will be in the sole possession of the defendant.   Nonetheless, without such facts, the plaintiff cannot state a claim and thus will never be entitled to discovery on the issue.

Applying *Iqbal* in such a manner would lead to unjust results that this Court does not believe the Supreme Court intended.   Unless a plaintiff lives in a jurisdiction in which the facts concerning a particular policy are made public by means other than the judicial process, for example, through a Department of Justice Report detailing the inner knowledge, policies and practices of a police department, a plaintiff is likely to have difficulty learning in great detail the policies and practices of a police department.   In theory, a plaintiff could resort to requests for records regarding policies to obtain the facts, or the plaintiff could rely on previously filed complaints to establish a policy or custom.   However, this Court has rarely seen a plaintiff

successfully rely on either.  *But see Wilson v. Montano*, 715 F.3d 847, 851 (10th Cir. 2013) (holding, post-*Iqbal*, that the plaintiffs had sufficiently alleged a policy or custom of illegal detentions where six plaintiffs' cases were *consolidated* and the combined allegations, taken as true, therefore stated a claim of an unconstitutional policy).   Thus, such a reading of *Iqbal* would require this Court to attempt to do justice with blinders on.   Further, it would potentially allow police departments to operate under a dangerous level of secrecy regarding their policies, particularly policies regarding training and supervision.   The Court believes *Iqbal* was intended to stem those cases in which implausible allegations of personal involvement by higher level supervisors were leading to fruitless and wasteful discovery excesses, *see Iqbal*, 556 U.S. at 685 (discussing the costly and time consuming nature of discovery and the magnification of the costs as against individuals charged with significant responsibilities), not to cut off access to the Court, including discovery, for well-recognized claims against local-level supervisors actually involved in the creation (or deliberately indifferent lack thereof) of training policies with regard to the individuals s/he commands.   *Cf. Brown,* 227 F.3d at 1289 (upholding jury verdict for lack of training; discussing police captain's testimony that he was the policy maker and he did not believe any further training for officers on how to effectuate an off duty arrest was necessary, though he recognized such arrests were "risky"); *Zuchel v. City and Cnty of Denver*, 997 F.2d 730, 741 (10th Cir. 1993) (upholding jury verdict for lack of training because of deficient "shoot/don't shoot" training).   It is on this understanding of *Iqbal*, as informed by *Dodds*, 614 F.3d at 1200, that the Court concludes that Plaintiff has stated a claim as to the affirmative link between Sheriff Burkhard and the excessive force allegedly used against Plaintiff.

        2.      <u>Plaintiff's Allegations State a Plausible Section 1983 Municipal Liability
Claim Against Valencia County and Burkhard in his Official Capacity.</u>

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court set forth the standard for a Section 1983 municipal liability claim.  The *Monell* Court held that a plaintiff may state a Section 1983 municipal liability claim when "the action that is alleged to be unconstitutional implements a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels."  *Id.* at 690-91.  To establish municipal liability, a plaintiff must demonstrate that (1) an officer committed an underlying constitutional violation, (2) a municipal policy or custom exists, and (3) there is a direct causal link between the policy or custom and the injury alleged—*i.e.*, that the policy or custom was the "moving force" behind the alleged injury.  *See id.*; *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  The "official policy" requirement was "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

"A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally-promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision."  *Schneider*, 717 F.3d at 770.   A policy is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy."  *Pembaur*, 475 U.S. at 483-84.   A course of conduct not expressly authorized by law constitutes "custom" with the force of law where it is "permanent" and "well settled."  *Monell*, 436 U.S. at 691 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

Plaintiff relies upon Valencia County's and Burkhard's failure to train their officers to satisfy the official policy or practice requirement.   To state a Section 1983 excessive force failure to train claim against a municipal defendant, a plaintiff must first, as a threshold matter, prove that the municipality's training was in fact inadequate, and then establish that

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997); *accord Brown*, 227 F.3d at 1286; *see also City of Canton*, 489 U.S. at 388.

Plaintiff has alleged that Valencia County and Burkhard in his official capacity were responsible for the implementation and promulgation of official policies governing officer encounters with mentally-ill individuals, [Doc. 12 ¶ 55], that they did not adopt any such policies, and that they did not adequately train or staff VCSD with officers qualified to respond to mental health encounters, [*id.* ¶¶ 35, 36].   In addition, as previously discussed, Plaintiff has alleged facts which establish that Defendant Hill exceeded the constitutional limitations on the use of force. Plaintiff also has alleged that Defendants have long been aware that there is a high probability that their officers may come into contact with mentally-ill individuals, [*id.* ¶ 34], and that the number of encounters with mentally-ill individuals placed Defendants on notice of the need for further training and additional policies and procedures, [*id.* ¶¶ 35, 36, 37, 56].   The Court concludes that these allegations are sufficient to meet Plaintiff's burden of sufficiently pleading that the training was inadequate as well as the first two additional elements of municipal liability as set forth in *Allen*.   *Allen*, 119 F.3d at 841-842.

32

As to the third requirement of deliberate indifference, our Tenth Circuit has held that "[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).   Although "[i]n most instances, notice can be established by proving the existence of a pattern of tortious conduct," in a "narrow range of circumstances, . . . deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction."  *Id.*   An example of such a narrow instance is "when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations."  *Id.*   Under these circumstances, even where a municipality's "policy is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy."  *Id.* (citing *Gray*, 227 F.3d at 1278).   "That a particular officer may be unsatisfactorily trained[, however,] will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.   It may be, for example, that an otherwise sound program has occasionally been negligently administered."  *City of Canton*, 489 U.S. at 390-91 (citations omitted); *accord Carr*, 337 F.3d at 1229 n.10 (citing *Canton*, 489 U.S. at 390-91).

Here, the Complaint alleges only a single instance of excessive force and does not allege the existence of a pattern of tortious conduct.   Because Plaintiff has not identified a pattern of violations, Plaintiff must satisfy his required showing that Valencia County itself, and Burkhard himself, had notice that the failures in training were likely to result in an excessive force violation

by alleging facts which establish that a violation of federal rights was a "highly predictable or plainly obvious consequence" of the municipal Defendants' failure to provide training. *Id.* at 1229. For many of the reasons stated above with regard to Plaintiff's claim as against Sheriff Burkhard in his individual capacity, the Court concludes that Plaintiff has met his burden of pleading that Valencia County and Sheriff Burkhard in his official capacity had notice of failures in their training and that the violation of federal rights which occurred here, using excessive force against a mentally ill individual, was a highly predictable and obvious consequence of the inadequate training. Plaintiff pleaded that the Sheriff and VCSD "knew or should have known that encounters with the mentally ill are common and its officers would need to be capable of . . . implementing proper methods for encounters, detention and arrests with the mentally ill." [Doc. 12, ¶ 57] This allegation is not conclusory, and further it is plausible that VCSD deputies would come into contact with the mentally ill. *See Steward*, 904 F.Supp.2d 1143, 1162 (D.Kan. 2012) (concluding, upon agreement of the parties that encounters with agitated and threatening mental ill individuals are a "usual and recurring situation with which officers must deal"). Plaintiff also alleged that "Although Valencia County was on notice that additional training was needed, VCSO did not adopt any standard operating procedures or written guidance . . . on how to deal with mentally ill, delusional or disoriented individuals" or "adequately train or staff the Department with any qualified officers to respond to mental health encounters, possibly suicidal individuals, or encounters with citizens experiencing delusional episodes or those who were confused and disoriented as a result of physical illness." [Doc. 12, ¶¶ 35-36] These allegations are sufficient to state a claim that Sheriff Burkhard and Valencia County were deliberately indifferent to providing adequate training regarding the constitutional rights of the mentally ill with whom the police officers come into contact. *See Allen*, 119 F.3d at 841-42.

Finally, the Court concludes that Plaintiff has pleaded that there was a "direct causal link between the constitutional deprivation and the inadequate training." *Id.* As stated above, with regard to Plaintiff's claim as against Sheriff Burkhard individually, there was no officer available with sufficient training to handle such an encounter with a mentally ill individual "due to the lack of seriousness of the VSCD and Sheriff Burkhard" with regard to training on encounters with the mentally ill. [Doc. 12, ¶ 59] Plaintiff also alleged that, because the officers on scene had not been adequately trained, they used methods "contrary to established police methods for subduing the mentally ill, delusional and disoriented." [Doc. 12, ¶ 60] These claims sufficiently plead the element that there be a "direct causal link between the constitutional deprivation and the inadequate training." *Allen*, 119 F.3d at 841-42.

A brief survey of the case law indicates that, allowing all reasonable inferences from the well-pleaded facts, Plaintiff may be able to establish that this case is like those in which our Tenth Circuit has held that there was sufficient evidence of a lack of training by a City or County and unlike those in which Our Circuit held that there was insufficient evidence. In *Allen*, the Court overturned summary judgment in favor of the city as to the plaintiff's claim that there was insufficient evidence in the record of inadequate training to deal with armed suicidal and mentally ill individuals. *Allen*, 119 F.3d at 842. In *Allen*, there was deposition testimony by the Plaintiff's expert that the officers acted contrary to accepted police practices by, within the span of 90 seconds, arriving on the scene, aggressively approaching suicidal man with gun, physically trying to take his gun away, and then shooting him when he pointed the gun at one of the officers. *Id.* at 839, 842-43. There was evidence that the city knew that encounters with armed individuals and mentally ill individuals were common for its officers, and, moreover, there was testimony by the city personnel that the officers acted in accordance with their training. *Id.* at 842-42. On the

35

basis of this testimony, the Court concluded that summary judgment was inappropriate on the plaintiff's insufficient training claim against the city.   *Id.*

Similarly, in *Zuchel*, our Tenth Circuit upheld a jury verdict concluding that there was sufficient evidence of the city and county's insufficient training of its officers on "shoot/don't shoot" scenarios, where the training received involved watching a video rather than any live range training, and where the plaintiff's expert testified as to the insufficiency of such training and its causal link to the officer shooting the plaintiff.   *Zuchel*, 997 F.2d at 739-40.   Likewise, in *Brown*, our Tenth Circuit upheld another jury verdict for the plaintiff on his insufficient training claim against the city where the officer shot the plaintiff while the officer was attempting to effectuate an off-duty arrest.   *Brown*, 227 F.3d at 1291.   There was testimony in the record that the officer acted in accordance with the training he received, and that the city's policy did not differentiate between the proper method of arresting individuals on duty or off duty.   *Id.* at 1289-90.   As to the causal link, the Court concluded that the jury could have properly rejected the city's theory that the officer acted out of road rage, which was not causally connected to any argued lack of training. *Id.* at 1291.   Instead, the Court stated:   "the jury clearly was presented with sufficient evidence to conclude Officer Gray's actions were directly attributable to his position as a Denver police officer and to the dearth of instruction he received on implementing the always armed/always on duty policy while off-shift."   *Id.* at 1290-91.

By contrast, in *Carr*, our Tenth Circuit concluded that summary judgment was properly entered on the plaintiff's failure to train claim, where officers fatally shot a man who had escaped them while they were attempting to arrest him by hitting and kicking the officers.   *Carr*, 337 F.3d 1224-25.   The man then fled on foot, picked up a four inch piece of concrete, and when he could run no further ran toward the officers and threw the piece of concrete at one of them.   *Id.* at 1225.

The officers began shooting at the man before the concrete left his hand.  *Id.*   The officers shot 11 times, and all of the shots that hit the man "entered his back side."  *Id.*   The fatal bullet entered his "buttocks, . . . traveled through his stomach and lungs and into his heart's pericardial sac."  *Id.* "According to Carr's experts, that could have occurred only if [the decedent] had his head near the ground with his buttocks slightly elevated."  *Id.*   After reviewing the evidence presented by the plaintiff, the Court first concluded that the plaintiff had not presented evidence of insufficient training with regard to "shoot/don't shoot" scenarios, and thus the plaintiff failed to establish deliberate indifference.  *Id.* at 1229-30.   Moreover, the Court concluded that the plaintiff failed to establish a causal link between any training (or lack thereof) because the plaintiff had not established that the officers were "trained by the City to shoot [the decedent] repeatedly in the back after he no longer posed a threat."  *Id.* at 1232.

The Court notes that none of the above cases required the Court to review a motion to dismiss.  Here, viewing the allegations in the light most favorable to Plaintiff, he has stated a claim against the County and Sheriff Burkhard in his official capacity for the failure to adequately train their deputies.   Plaintiff's allegations are more akin to the facts discussed in *Allen*, *Zuchel*, and *Brown* than those in *Carr*.

III.     Plaintiff has not Stated a Viable Section 1983 Claim for Violation of his Constitutional Right to Substantive Due Process.

Defendants argue that the Court should dismiss Plaintiff's Section 1983 substantive due process claims against them, because the Supreme Court has held that substantive due process claims are inappropriate where more specific protections are available under other constitutional amendments.   *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of

government behavior, 'that Amendment, not the more generalized notion of 'substantive due process', must be the guide for analyzing these claims.'") (quoting *Graham*, 490 U.S. at 395). Plaintiff concedes that, if Defendants acknowledge Plaintiff was seized within the meaning of the Fourth Amendment when he was shot, "this case should be analyzed on the Plaintiff's theories under the Fourth Amendment . . . and not substantive due process."   [Doc. 21 at 14].   Defendants do not dispute that Plaintiff was seized for purposes of the Fourth Amendment.   Therefore, the Court dismisses Plaintiff's Section 1983 substantive due process claims.

IV.   Plaintiff Has Stated a Viable Claim for Battery, Assault, and False Imprisonment.

Plaintiff alleges that Defendants Hill and Burkhard are liable for battery, assault, and false arrest.   [Doc. 12 ¶¶ 66-71].   The New Mexico Tort Claims Act ("NMTCA") "grants immunity from tort liability to governmental entities and public employees acting within the scope of duty except as waived by specific provisions of the Act."   *Dunn v. McFeeley*, 984 P.2d 760, 766 (N.M. 1999).   Section 41-4-12 of the NMTCA waives immunity where a law enforcement officer inflicts "personal injury, bodily injury, [or] wrongful death . . . resulting from assault, battery, false imprisonment, false arrest, [or] deprivation of any rights, privileges or immunities secured by the constitution."   N.M. Stat. Ann. § 41-4-12.   Because Plaintiff alleges that Defendants have committed the torts of battery, assault, and false imprisonment/arrest, and because Section 41-4-12 contains a waiver of immunity for these claims, Defendants are not immune from Plaintiff's tort claims.

The parties do not dispute that Defendant Hill intended to shoot Plaintiff, and that he thereby intended to detain Plaintiff and to commit a battery and assault upon Plaintiff. Defendants maintain, however, that they were privileged to seize Plaintiff through the use of deadly force pursuant to New Mexico Statutes Annotated Section 30-2-6, which grants police

38

officers immunity from criminal homicide charges, as well as immunity from claims arising out of the use of deadly force more generally, under certain circumstances.[5]   Section 30-2-6 provides in relevant part, "Homicide is justifiable when committed by a public officer . . . when necessarily committed in overcoming actual resistance to the execution of some legal process or to the discharge of any other legal duty."  N.M. Stat. Ann. § 30-2-6(A)(2).  Section 30-2-6 further provides that "homicide is necessarily committed when a public officer or public employee has probable cause to believe he or another is threatened with serious harm or deadly force while performing those lawful duties described in this section."  *Id.* § 30-2-6(B).

Section 30-2-6 provides law enforcement officers with a wider scope of privilege than the general public with regard to the use of deadly force in self-defense.  *See id.* at 280.  For example, the "immediacy" requirement necessary for self-defense or defense of others does not appear in Section 30-2-6.  *See id.*  Further, Section 30-2-6(B) provides that a law enforcement officer may use deadly force if he or she has "probable cause to believe [s/]he or another is threatened with serious harm," while an individual claiming self-defense must demonstrate s/he faces "apparent danger of immediate death or great bodily harm."  *Id.* at 280-81 (quoting N.M. UJI 14-5171).

> Under Section 30-2-6, the crucial consideration is the conduct and dangerousness of the suspect, not the classification of the crime that he or she has committed or is alleged to have committed.   It is also apparent, through the inclusion of "probable cause" in Section

---

[5]   "While Section 30-2-6 speaks of justifiable homicide, [New Mexico courts] read it as authorizing the use of deadly force by law enforcement officers whether or not the suspect is ultimately killed."  *State v. Mantelli*, 42 P.3d 272, 278 (N.M. Ct. App. 2002) (citing *Graham*, 490 U.S. at 395 ("All claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest ... of a free citizen should be analyzed under the Fourth Amendment and its '[objective] reasonableness' standard.") (emphasis omitted)), *cert. denied*, 428 P.3d 842 (N.M. 2002).

30-2-6(B), that the reasonableness of an individual police officer's actions is an objective analysis evaluated from his perspective at the time of the incident and is necessarily a factual inquiry.

*Mantelli*, 42 P.3d at 278.   Although "[i]t is unclear [under Section 30-2-6] how temporally proximate and severe the suspect's threatening actions must be to justify the use of deadly force by a police officer," what is clear is that the inquiry is both "factual and situational" and "explores the definition of 'reasonableness' under the Fourth Amendment." *Id.* (citing *State v. Johnson*, 954 P.2d 79 (N.M. Ct. App. 1997)).

This Court already has held that Plaintiff has stated an excessive force violation under the reasonableness standard of the Fourth Amendment.   For those same reasons, the Court concludes that Plaintiff has stated a claim for assault and battery from which Defendants Hill and Burkhard are not shielded by Section 30-2-6.   Plaintiff's allegations, construed in the light most favorable to Plaintiff, establish that Defendant Hill did not have probable cause to believe that Plaintiff was threatening him or another with serious harm or deadly force.   Thus, Section 30-2-6 does not shield Defendants from liability.   Because Plaintiff has alleged plausible facts that "nudge" his assault and battery claims over the line from speculative to plausible, the Court denies Defendants' motion to dismiss Plaintiff's assault and battery claims. *Iqbal*, 556 U.S. at 680.

The Court also denies Defendants' motion to dismiss Plaintiff's false imprisonment claim. Defendants argue that the arrest "effectuated of Plaintiff was entirely proper . . . , there was probable cause to detain Plaintiff, and thus no claim of . . . false arrest can be sustained as a matter of law." [Doc. 18 at 11].   Defendants further contend that "[t]he circumstances as alleged by Plaintiff [are] that he had threatened to blow up the house, all of the family had evacuated except his father-in-law, whose residence it was, he was within 20 feet of the officers armed with a weapon . . . he refused to put down when commanded, and actually proceeded towards the

40

officers."   [*Id.*].

The Court is not persuaded by Defendants' contentions.   Even if the facts alleged gave rise to reasonable suspicion to investigate Plaintiff for a crime involving a threat to "blow up" a house, these facts would justify detaining Plaintiff but not justify using deadly force against him. Plaintiff's false imprisonment claim is premised upon Defendant Hill's action of shooting Plaintiff, not Hill's act of investigating Plaintiff.   The Complaint specifically challenges Hill's detention of Plaintiff *after* Hill shot Plaintiff.   Plaintiff alleges that it was this post-shooting detention that "was without just cause" and that "constitutes a false arrest."   [Doc. 12 at 11 ("Defendant Hill's actions . . . in shooting the Plaintiff without justification constitutes assault and battery.   *Thereafter* the detention of the Plaintiff was without just cause and constitutes a false arrest.") (emphasis added)].

Under New Mexico law, "[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so."   N.M. Stat. Ann. § 30-4-3; *accord Romero v. Sanchez*, 895 P.2d 212, 215 (N.M. 1995). An officer can be liable for false arrest, a form of false imprisonment, when the "facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate."   *Id.*; *see Perea v. Stout*, 613 P.2d 1034, 1039-40 (N.M. Ct. App.) (holding that a law enforcement officer's reasonable belief that seizure and detention of a plaintiff was necessary was a defense to claim of false imprisonment), *cert. denied,* 615 P.2d 991, *and cert. denied,* 449 U.S. 1035 (1980); *State v. Ryder*, 649 P.2d 756, 758 (N.M. Ct. App. 1982) (stating that court must examine detention to see if facts available to detaining officer would warrant person of reasonable caution to believe detention appropriate), *aff'd,* 648 P.2d 774 (N.M. 1982).

The facts alleged by Plaintiff do not suggest that Defendant Hill held a reasonable belief

41

that his use of deadly force to seize Plaintiff was appropriate.   The Court already has held that Plaintiff has stated a Section 1983 claim for excessive force because a reasonable officer in Hill's position would not have believed that it was appropriate to shoot Plaintiff twice when Plaintiff was not committing any crime, did not present an immediate threat to safety, and was not resisting arrest or attempting to flee the scene.   The Court also has held that Plaintiff has stated tort claims for assault and battery because Hill did not have probable cause to believe that Plaintiff was threatening him or another with serious harm or deadly force.   The same reasoning that supported these holdings also supports the Court's conclusion that Plaintiff has stated a false arrest claim. On the facts alleged by Plaintiff, a reasonable officer in Hill's position would not have believed that a detention of Plaintiff effectuated through deadly force was appropriate.   *Cf. Romero*, 895 P.2d at 215; *Perea*, 613 P.2d at 1039-40.   Thus, because Plaintiff's facts establish that Hill restrained Plaintiff without Plaintiff's consent and that Hill restrained Plaintiff with knowledge that Hill had no lawful authority to do so, the Court holds that Plaintiff has stated a false arrest claim against Hill.   *Cf.* N.M. Stat. Ann. §30-4-3.   Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false imprisonment claim.

V.     Plaintiff Has Stated A Claim Under Title II of the Americans with Disabilities Act Against the Municipal Defendants but not the Individual Defendants.

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   To state a claim under Title II, a plaintiff must allege that (1) s/he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3)

42

such exclusion, denial of benefits, or discrimination was by reason of a disability.   *See Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007).   Defendants move for dismissal of Plaintiff's ADA claims against the individual Defendants on the ground that neither the ADA nor Section 1983 provide for claims against public employees or supervisors in their individual capacities.   Defendants also move for dismissal of Plaintiff's ADA claims against the municipal Defendants on the ground that Plaintiff has failed to allege facts which establish the second and third elements of a Title II claim.[6]

> A.   Plaintiff has not Stated an ADA Claim Against Defendants Hill, Martin, or Burkhard in their Individual Capacities.

Plaintiff does not specify against whom he brings his ADA claim.   To the extent Plaintiff asserts an ADA claim against Defendants Hill, Martin, and Burkhard in their individual capacities, the Court holds that neither the ADA nor Section 1983 authorizes such claims against public employees in their individual capacities.   Accordingly, Plaintiff has not stated a plausible ADA or Section 1983 claim against Defendants Hill, Martin, or Burkhard in their individual capacities, and the Court therefore dismisses those claims pursuant to Rule 12(b)(6).

Title II of the ADA provides that a qualifying person may not be denied the "benefits of services, programs, or activities of a *public entity,* or be subjected to discrimination by any such *entity.*"   42 U.S.C. § 12132 (emphasis added).   The plain language of Title II therefore suggests that officials may not be sued in their individual capacities.   *See Braverman v. New Mexico*, No. CIV-11-0829 JB/WDS, 2011 WL 6013587, *22 (D.N.M. Oct. 19, 2011).   "Although

---

[6]   For purposes of their motion, Defendants assume that Plaintiff has alleged facts sufficient to satisfy the first element of a Title II claim—*i.e.*, that Plaintiff was a qualified individual with a disability.   [Doc. 18 at 14 ("[e]ven assuming that Plaintiff was mentally impaired within the meaning of the ADA . . .")].

the Tenth Circuit has not yet addressed whether Title II of the ADA permits plaintiffs to sue state

officials in their individual capacities, several other circuits have held that ADA plaintiffs may not

sue individuals in such a capacity."[7]  *See id.* (citing *Badillo v. Thorpe*, No. 05-12766, 2005 WL

3249481, *2 (11th Cir. Dec. 1, 2005) (unpublished decision) ("To the extent that [the plaintiff]

seeks to hold [the defendant] personally liable, there is no individual capacity suit under Title II of

the ADA"); *Carten v. Kent State Univ.*, 282 F.3d 391, 396-97 (6th Cir. 2002) (holding that a

defendant must be held responsible in "his or her official capacity for violating Title II, which by

its terms applies only to 'public entit[ies]'"); *Garcia v. S.U.N.Y. Health Scis. Ctr.*, 280 F.3d 98,

107 (2d Cir. 2001) ("Insofar as [the plaintiff] is suing the individual defendants in their individual

capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual

capacity suits against state officials."); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th

Cir. 1999) ("[T]he commissioners may not be sued in their individual capacities directly under the

provisions of Title II," for "Title II provides disabled individuals redress for discrimination by a

'public entity.'")).   Moreover, to the extent Plaintiff attempts to invoke Section 1983 to impose

liability upon the individual Defendants, this theory likewise fails.   *See Faircloth v. Schwartz*, No.

12-CV-02764-REB-KLM, 2014 WL 4466663, *17 (D. Colo. Sept. 10, 2014) (noting that "[t]hree

Circuit Courts of Appeal have held that the ADA's detailed remedial scheme bars plaintiffs from

maintaining a § 1983 action against individual defendants for alleged violations of the ADA" and

holding that, "to the extent that the Complaint purports to bring § 1983 claims against Defendants

---

[7]   While our Tenth Circuit has not specifically opined whether individual supervisors are liable
under Title II of the ADA, it has expressly held that individual supervisors are not liable under
Title I of the ADA because they do not qualify as "employers" within the meaning of the statute.
*See Butler v. City of Prairie Village*, 172 F.3d 736, 743 (10th Cir. 1991) (recognizing that Title
VII, Title I of the ADA, and the ADEA all prohibit employer discrimination and do not authorize
personal capacity suits against individuals who do not otherwise qualify as "employers" under the
statutory definitions) (internal quotation marks and citations omitted).

in their individual capacities for alleged violations of the ADA, such claims fail as a matter of law") (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997) (holding that "a plaintiff may not maintain a Section 1983 action in lieu [of or] in addition [to an] ADA cause of action if the only alleged deprivation is of the [individual's] rights created by the . . . ADA"); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) ("join[ing] the Fifth, Eighth, and Eleventh Circuits and hold[ing] that a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA"); *Alsbrook*, 184 F.3d at 1011 (holding that a plaintiff cannot bring a Section 1983 suit to vindicate rights created under Title II)).   Accordingly, the Court dismisses any claims seeking to impose Section 1983 liability upon the individual Defendants for violation of Title II of the ADA.

      B.    <u>Plaintiff has Stated an ADA Claim Against Municipal Defendants Valencia County and Burkhard in his Official Capacity</u>.

Defendants move to dismiss Plaintiff's Title II ADA claims against municipal Defendants Valencia County and Burkhard in his official capacity.   Defendants contend that Plaintiff has not alleged facts which satisfy the second or third elements of a Title II claim.   Those elements require a plaintiff to establish that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities and that the exclusion, denial of benefits, or discrimination was by reason of a disability.   *See Robertson*, 500 F.3d at 1191.

A public service program, or activity, for purposes of Title II, encompasses almost "anything a public entity does."   *Sheehan v. City and Cnty of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *cert granted*, 135 S.Ct. 702 (2014) (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (internal quotations and citation omitted), *cert. denied*, 539 U.S. 938 (2003)); *see Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998).   Although the ADA

itself does not define "programs, services, or activities," a broad construction is supported by the plain language of the Rehabilitation Act of 1973, which, defines "program or activity" as "'all of the operations of' a qualifying local government." *Barden*, 292 F.3d at 1076-77 (quoting 29 U.S.C. § 794(b)(1)(A)).   The legislative history of the ADA provides that Title II "simply extends the anti-discrimination prohibition embodied in [the Rehabilitation Act] to all actions of state and local governments." *Id.* at 1077 (quoting H.R. Rep. No. 101-485(II), at 84 (1990)).   The Rehabilitation Act's broad definition of covered activities and the ADA's legislative history together support a broad construction of Title II of the ADA.   Moreover, a broad construction is appropriate because "[a]ttempting to distinguish which public functions are services, programs, or activities, and which are not, would disintegrate into needless 'hair-splitting arguments.'"   *Id.* at 1076 (quoting *Innovative Health Sys, Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997)).

The Tenth Circuit stated in *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999), that it is an open question whether the public "programs, services, or activities" covered by Title II include arrests, "investigations potentially involving an arrest," and "violent confrontations not technically involving an arrest." *Id.* at 1220 n.2; *id.* at 1221.   In *Gohier*, the estate of the decedent brought an ADA claim against the defendants, arguing that a police officer's use of deadly force to defend against a perceived threat arising out of conduct that was the result of the decedent's mental disability violated Title II.   *See id.* at 1222.   The *Gohier* court explained that federal courts have "addressed Title II claims arising from arrests under [the wrongful arrest and failure to accommodate] theories." *Id.* at 1220 (citing *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1158-60 (W.D. Wash. 1999) (surveying cases)).   Under the wrongful arrest theory, an officer misperceives lawful conduct caused by the decedent's disability as criminal activity and then arrests him for that conduct.   *See id.*   Under the failure to accommodate theory, the police properly investigate and

46

arrest a person with a disability for a crime unrelated to that disability but fail to reasonably accommodate the person's disability in the course of investigation or arrest. *See id.* at 1220-21.

The *Gohier* plaintiff, however, could not substantiate an ADA claim under either theory. The court explained that the wrongful arrest theory did not apply because the decedent's conduct was not lawful and the officer did not arrest the decedent, *see id.* at 1220, and that the reasonable accommodation theory did not apply because the plaintiff had not invoked a failure to accommodate claim, *see id.* at 1221. Because the plaintiff in *Gohier* could not substantiate a claim under either theory, the court did not need to answer the question whether the arrests in question fell within Title II's ambit. *See id.* at 1221. Thus, in the end, the *Gohier* court only rejected a categorical rule excluding arrests from the scope of Title II. *See id*.

Plaintiff argues that his arrest implicates Title II under both a wrongful arrest and a reasonable accommodation theory. [Doc. 21 at 11 (Plaintiff's "threats and self harm were misperceived as criminal or alternatively the execution of the encounter was done in a manner that failed to accommodate [Plaintiff's] disability")]. Defendants do not challenge Plaintiff's ADA municipal claim on the ground that arrests falls outside the ambit of Title II as a matter of law but rather only contend that the facts alleged by Plaintiff do not state a claim under Title II. Thus, for purposes of Defendants' motion to dismiss, the Court assumes that Defendants' encounter with Plaintiff constitutes a public service, program, or activity within the meaning of Title II of the ADA.

The Court rejects Defendants' argument that Plaintiff has not stated an ADA claim and instead holds that Plaintiff's facts state a claim under both the wrongful arrest and failure to accommodate theories. *Cf. Gohier*, 186 F.3d at 1220. Consistent with the wrongful arrest theory, Plaintiff alleges that Defendant Hill misperceived Plaintiff's lawful conduct of holding a

47

baseball bat, failing to drop the bat, and taking one step forward as criminal conduct.   Plaintiff

also alleges facts which establish that this conduct of Plaintiff's was caused by his disability,[8] and

that Defendant Hill, due to his misperception of Plaintiff's behavior as criminal, seized Plaintiff

through the use of excessive force.   Although Defendants did not formally arrest Plaintiff, the

*Gohier* court explained that the wrongful "arrest" theory includes "investigations potentially

involving an arrest" and "violent confrontations not technically involving an arrest."  *Id.* at 1220

n.2.   Because Defendant Hill's seizure of Plaintiff falls within this broad definition of arrest, and

because Plaintiff has alleged facts which implicate the wrongful arrest theory, the Court holds that

Plaintiff has stated a plausible Title II claim under the ADA.

        The Court also holds that Plaintiff has alleged facts which state a plausible Title II ADA

claim premised upon Defendants' failure to reasonably accommodate Plaintiff's disability during

the course of their investigation and detention of Plaintiff.   The reasonable accommodation theory

posits that a Title II ADA violation occurs when the police properly investigate and arrest a person

with a disability for a crime unrelated to that disability but fail to reasonably accommodate the

person's disability in the course of investigation or arrest.  *See id.* at 1220-21.  Plaintiff has

alleged that Defendants Valencia County and VCSD had "no formal policies and little or no

training in performing citizen caretaker encounters with the disabled or mentally ill," and that

"Defendants Hill and Martin failed to perform a community caretaker encounter in a manner that

---

[8]   Although Defendants contend that Plaintiff engaged in the unlawful conduct of threatening to
blow up a house, Defendants have not argued—and Plaintiff's allegations do not establish—that
Defendants utilized force to seize Plaintiff because of Plaintiff's threat to blow up the residence or
that Plaintiff had taken any overt steps in furtherance of this threat.   Rather, Defendants contend
only that Hill utilized force to seize Plaintiff in response to Plaintiff's conduct of failing to drop a
baseball bat and taking a step towards officers because Hill believed Plaintiff posed a threat to
officer or third-party safety.   Thus, the Court considers only whether Defendant Hill's response to
this conduct of Plaintiff's violated Title II of the ADA.

reasonably accommodated the Plaintiff's disability."   [Doc. 12 ¶¶ 84, 86].   The Court concludes that these allegations, in conjunction with Plaintiff's allegations establishing that Defendants shot Plaintiff twice when Plaintiff posed no immediate threat to Defendants, are sufficient to state a Title II ADA claim under the failure to accommodate theory.   Because Plaintiff has alleged facts which state a plausible Title II ADA claim under both a wrongful arrest and failure to accommodate theory, the Court denies Defendants' motion to dismiss Plaintiff's ADA claim against the municipal Defendants.

The Court is not persuaded to hold otherwise by the authorities upon which Defendants rely, including:   *Gohier*, 186 F.3d 1216, *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), *cert. denied*, 531 U.S. 959 (2000); and *Thompson v. Williamson County*, 219 F.3d 555 (6th Cir. 2000). Defendants' authorities stand for the proposition that a plaintiff cannot sustain a Title II ADA claim when it is the plaintiff's unlawful conduct, and not his or her disability, which causes the police to respond with force.   These cases are inapposite because the facts alleged by Plaintiff do not establish that Plaintiff engaged in unlawful conduct that necessitated the use of force.

In *Gohier*, our Tenth Circuit held that the wrongful arrest theory was inapplicable because "[the plaintiff's] conduct was not lawful," and "[the officer] used force on [the plaintiff] not to effect an arrest, but to defend himself from a perceived threat.   When [the officer] shot [the plaintiff], he reasonably thought it necessary to do so to avoid serious harm or death."   186 F.3d at 1222.   The *Gohier* court recognized that the plaintiff "may not have been criminally responsible under [state] law for his unlawful conduct" and "assume[d] that said conduct was the unfortunate result of a 'disability' in terms of the ADA," but nonetheless held that "whether or not [the officer] would have formally arrested [the plaintiff], had that been possible, and whether or not a jury would ultimately have convicted [the plaintiff] of any crime, [the officer's] use of force in

49

self-defense [wa]s simply unlike the wrongful arrests" in other cases in which the courts deemed the plaintiffs' ADA claims viable.  *Id.*  The court reasoned that in those cases the plaintiffs had not engaged in unlawful conduct that precipitated the officers' use of force.  *Id.* (citing *Lewis v. Truitt*, 960 F. Supp. 175, 176-77 (S.D. Ind. 1997); *Jackson v. Town of Sanford*, No. 94-12-P-H, 1994 WL 589617, *1 (D. Me. Sept. 23, 1994)).

The *Gohier* court explained, "In *Lewis* [*v. Truitt*], the[ police] beat and arrested . . . a deaf man who could not understand their commands; in *Jackson* [*v. Town of Sanford*], they arrested for drunk driving a man who was sober, and whose unsteadiness and slurred speech resulted from a past stroke."  *Id.* (citing *Lewis*, 960 F. Supp. at 176-77; *Jackson*, 1994 WL 589617, at *1).  The court distinguished these cases, explaining that the plaintiffs' conduct in *Lewis* and *Jackson* "did not warrant the police response at issue in those cases, *i.e.*, arrest," whereas "[the *Gohier* plaintiff's] threatening conduct . . . did warrant the police response at issue . . . , *i.e.*, the use of force in self-defense."  *Id.*

The facts alleged by Plaintiff are not akin to those in *Gohier* but rather are analogous to those in *Lewis* and *Jackson*.  In *Gohier*, the decedent, at a distance of 30 to 35 feet from the officer, began "walking toward [the officer] at a 'fast pace,'" with a "'crazed and wild-eyed'" look, "'teeth gritted,'" and right hand behind back, ignoring the officer's command to stop.  *Id.* at 1217-18.  Although the officer asked the decedent to show his hands, the decedent continued to advance and "raised his right hand from behind his back and began repeatedly swinging it down and forward in a stabbing motion" while holding "a long, slender object that [the officer] thought was a knife."  *Id.* at 1218.  The officer thereafter retreated five to seven feet behind his car and repeatedly ordered the decedent to drop the knife.  *See id.* at 1218.  The decedent did not obey "but instead advanced to the driver's side door of the car" and said, "'Do you like your car'" and

50

"'It's gone,'" while opening the car door.   *Id.*   The officer moved forward to stop the decedent, and the decedent "then let go of the door and either stepped or lunged toward [the officer], making a stabbing motion with the object."   *Id.*   At this time, the officer shot the decedent twice.   *See id.*

The facts alleged in this case are distinguishable and indicate that Plaintiff, who was separated from the officers by twenty feet and a pool table, took a step forward with a baseball bat in his hand, despite two commands from the officer to drop the bat.   Defendant Hill thereafter immediately shot Plaintiff twice.   These facts are distinguishable from those in *Gohier* for many reasons:   (1) the *Gohier* plaintiff wielded what the officer perceived to be a knife whereas this Plaintiff held a baseball bat which Plaintiff claimed to be a shotgun; (2) the *Gohier* plaintiff was not trying to commit suicide whereas this Plaintiff was trying to commit suicide; (3) the *Gohier* plaintiff advanced towards the officer at a fast pace with a "wild-eyed" look whereas this Plaintiff from twenty feet away took a step forward towards Hill; (4) the *Gohier* plaintiff closed the distance between himself and the officer whereas this Plaintiff remained separated from Hill by a pool table and one step shy of twenty feet; (5) the *Gohier* plaintiff continued to advance despite the officer retreating five to seven feet whereas in this case Hill did not retreat and the Plaintiff advanced only one step; (7) the *Gohier* plaintiff threatened the officer's vehicle and opened the vehicle's door whereas this Plaintiff made no threat to the officers; and (8) the *Gohier* plaintiff lunged at the officer and made a stabbing motion with his hand holding what the officer perceived as a knife while in close proximity to the officer whereas this Plaintiff was never in close proximity to Hill, did not lunge at the officers or Gurule, did not swing his hand or the bat towards the officers or Gurule, and was not likely to swing the bat because he erroneously claimed it to be a shotgun. *See id.*

These factual distinctions are significant and render the Tenth Circuit's holding in *Gohier*

51

inapplicable.   The *Gohier* court held that the wrongful arrest theory did not implicate Title II because the officer used force reasonably to defend himself from a perceived threat and to avoid serious harm or death.   *See id.*   Stated differently, in *Gohier* the court reasoned that the plaintiff's unlawful conduct, and not the plaintiff's mental illness, caused the officer's response.   Here, in contrast, Plaintiff's conduct was not unlawful and therefore the Court cannot attribute Defendant Hill's response of shooting Plaintiff to that conduct.   Plaintiff's actions of exiting the bedroom, holding a baseball bat which he claimed to be a shotgun, refusing to drop the bat, and stepping forward while still separated from the officers by approximately twenty feet and a pool table, does not constitute threatening or unlawful conduct that warranted Hill's response of shooting Plaintiff twice.   Thus, the break in the chain of causation present in *Gohier* does not exist here.

Rather, the Court concludes that Plaintiff's conduct was akin to that in *Lewis* or *Jackson*. The *Gohier* court distinguished these cases, explaining that the *Lewis* and *Jackson* plaintiffs' conduct "did not warrant the police response at issue in those cases."   *Id.*   Similarly, this Court holds that Plaintiff's conduct did not warrant Hill's response of shooting Plaintiff twice.   Thus, contrary to Defendants contention, the Court concludes that *Gohier* supports—rather than negates—the conclusion that Plaintiff's facts state a Title II ADA claim.

The Court likewise is not persuaded by Defendants' citation to *Hainze*, 207 F.3d 795, in which the Fifth Circuit held that officers on the scene are not required to comply with Title II of the ADA "in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and nearby civilians," because to hold otherwise "would pose an unnecessary risk to innocents."   *Id.* at 801.   The *Hainze* court explained that it was not persuaded that requiring law enforcement officers "to use less than reasonable force in defending themselves and others, or to hesitate to consider other possible actions in the course of making such split-second decisions, is

52

the type of 'reasonable accommodation' contemplated by Title II."   *Id.* at 801-02.

The express holding of *Hainze* applies only in the face of exigent circumstances and prior to the time that officers secure the scene and ensure the safety of "innocents."   *Id.*   The facts of *Hainze* are distinguishable because exigent circumstances were not present on the facts alleged by Plaintiff here.   In *Hainze*, when the officer "reached the convenience store parking lot, [the plaintiff] was holding a knife and standing next to a pickup truck occupied by two persons," the officer "did not then know that the persons were unharmed," "[a]fter being ordered to get away from the truck, [the plaintiff] immediately walked quickly towards [the officer] with the knife, ignoring [the officer's] repeated orders to stop," and "[t]he officer did not shoot until [the plaintiff] was within a few feet."   *Id.* at 801.   These facts support the Tenth Circuit's conclusion that the officer faced exigent circumstances and the scene was not safe and secure.   Plaintiff here, however, has not alleged facts, which, if true and viewed in the light most favorable to Plaintiff, suggest that Hill or Martin faced exigent circumstances akin to those in *Hainze*.   The Court already has held that Plaintiff did not present a serious or immediate threat to the safety of others and that Hill's response of shooting Plaintiff twice was unreasonable for this reason.   Because the facts of *Hainze* are distinguishable, the Court concludes that *Hainze* is inapplicable.

The Court also is not persuaded by Defendants' citation to *Thompson*, 219 F.3d 555, in which the Sixth Circuit held that Title II did not apply because it was the decedent's threat to the officer's safety—and not the decedent's disability—which caused the plaintiff's injury.   *See id.* at 558.   The *Thompson* court reasoned that

> [the officer's] failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before the officer could subdue him.   Thus, if the decedent was denied access to medical services it was because of his violent,

threatening behavior, not because he was mentally disabled.

*Id.* (citation omitted). The court in *Thompson* explained that, although the decedent's family contacted the police to help transport the decedent to a mental facility, the officer first had to disarm the decedent prior to transporting him. *See id.* When the officer arrived on the scene, the decedent "spotted [the officer] and began to come toward [the officer] with the two machetes," the decedent ignored the officer's order to drop the machetes, and the decedent instead "raised one of the machetes as if to throw it at [the officer], whereupon [the officer] shot and killed the decedent." *Id.* at 556. These facts in *Thompson* suggest that the decedent posed an immediate threat to officer safety, whereas here the Court already has held here that Plaintiff's alleged facts do not establish any such threat. Thus, the reasoning of *Thompson*, like that in *Hainze* and *Gohier*, is inapplicable.[9]

For the foregoing reasons, the Court holds that Plaintiff has alleged facts which state a plausible Title II ADA claim under both the wrongful arrest and failure to accommodate theories and that Defendants' arguments to the contrary lack merit. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's Title II ADA claim against the municipal Defendants Valencia County and Burkhard in his official capacity.

---

[9] For the same reasons, the Court likewise is not persuaded by the District of Colorado's holding in *Buben v. City of Lone Tree*, No. 08-CV-00127-WYD-MEH, 2010 WL 3894185, at *1 (D. Colo. Sept. 30, 2010). In *Buben*, the district court held that the wrongful arrest theory did not apply because, as in *Gohier*, the *Buben* plaintiff's conduct was not lawful and therefore his conduct warranted the police response he received. *See id.* at *11. The *Buben* officers were dispatched to the scene to investigate a criminal mischief complaint involving the plaintiff, and it was undisputed that the plaintiff "threw articles of personal property, including furniture, off his third floor balcony, broke all of the windows in the apartment and the glass door to the balcony, and failed to comply with officers' commands." *Id.* The *Buben* court held that, "[e]ven assuming Plaintiff's conduct was the result of a disability, his conduct warranted a police response because his conduct was unlawful" and therefore the wrongful arrest theory did not support the plaintiff's claim. *Id.* Because Plaintiff's facts do not establish that he engaged in unlawful conduct which merited Hill's response of shooting Plaintiff twice, *Buben* is distinguishable.

54

## CONCLUSION

**IT THEREFORE IS ORDERED** that Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and for Qualified Immunity and Memorandum in Support Thereof [Doc. 18], filed April 29, 2014, is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)   The Court grants Defendants' motion to dismiss Plaintiff's 42 U.S.C. Section 1983 excessive force claim against Defendant Martin.

(2)   The Court denies Defendants' motion to dismiss Plaintiff's 42 U.S.C. Section 1983 excessive force claim against Defendant Hill.

(3)   The Court denies Defendants' motion to dismiss Plaintiff's 42 U.S.C. Section 1983 supervisory liability claim against Defendant Burkhard in his individual capacity.

(4)   The Court denies Defendants' motion to dismiss Plaintiff's 42 U.S.C. Section 1983 municipal liability claims against Defendants Valencia County, VCSD, and Burkhard in his official capacity.

(5)   The Court grants Defendants' motion to dismiss Plaintiff's 42 U.S.C. Section 1983 substantive due process claims.

(6)   The Court denies Defendants' motion to dismiss Plaintiff's battery, assault, and false imprisonment/false arrest claims against Defendants Hill and Burkhard.

(7)   The Court grants Defendants' motion to dismiss Plaintiff's ADA claims against Defendants Hill, Martin, and Burkhard in their individual capacities.

    (8)    The Court denies Defendants' motion to dismiss Plaintiff's ADA claims against Defendants Valencia County and Burkhard in his official capacity.

**SO ORDERED** this 30th day of March, 2015.


_____
M. CHRISTINA ARMIJO
CHIEF UNITED STATES DISTRICT JUDGE