**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

SEP 2 3 2016

**MATTHEW J. DYKMAN**
CLERK

NATHAN FELTS,

            Plaintiff,

v.                                                        No. 13-CV-1094 MCA/SCY

BOARD OF COUNTY COMMISSIONERS OF
VALENCIA COUNTY, VALENCIA COUNTY
SHERIFF'S DEPARTMENT, SHERIFF LOUIS
BURKHARD, DEPUTY SHERIFF DAVID HILL,
and DEPUTY SHERIFF JENNIFER MARTIN,

            Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment and Brief in Support* [Doc. 44] filed November 20, 2015; and *Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support* [Doc. 46] filed November 20, 2015.  This Court, has considered the *Motions*, the briefs, the relevant law, and is otherwise fully informed.

Procedural History

The early procedural history of this case, having been described in this Court's *Memorandum Opinion and Order* [Doc. 29] on *Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and for Qualified Immunity and Memorandum in Support Thereof* [Doc. 18], need not be repeated here.  Presently, Defendants seek summary judgment as to Plaintiff's excessive force claims, Plaintiff's claims under the ADA, Plaintiff's supervisory liability claims, and two aspects of Plaintiff's claim for damages.

1

[Doc. 44] Plaintiff seeks summary judgment on his excessive force claim against Deputy Hill, his claim against Valencia County and Burkhard for failing to train Deputies Hill and Martin, and his ADA claim against Valencia County.  [Doc. 46]

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  An issue is "genuine" when the evidence before the Court is such that a reasonable jury could return a verdict in favor of the nonmovant as to that issue.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-52 (1986).  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  *Id.* at 248.  Judgment is appropriate as a matter of law if the nonmovant has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).

It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).  Rather, the Court assumes the admissible evidence of the nonmovant to be true, resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant.  *Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999).

2

**Undisputed Facts**

The following basic facts are undisputed. Deputy Hill shot Plaintiff, who is mentally ill, twice—once in the mouth and once in the shoulder. [Doc. 46 ¶ 34; Doc. 51 ¶ 34] The shooting occurred inside the residence of Plaintiff's parents-in-law, Cristie and Theresa Gurule to which Deputies Hill and Martin had been dispatched in response to a 911 call from Plaintiff's sister-in-law, Angela. [Doc. 46 ¶¶ 6, 10, 14; Doc. 51 ¶¶ 6, 10, 14]

Angela advised the 911 operator that Plaintiff was at the Gurules' house where he had held his wife, children, and the Gurules hostage. [Doc. 46-3] She reported that the family had gotten away and were at her house, and that Mr. Gurule was on his way back to the house. [Id.] She also reported that Plaintiff had the gas leaking in the house, and that he had a bat with him, but no guns. [Id.]

The dispatcher who communicated with Deputies Hill and Martin relayed that it was "unknown" whether Plaintiff had a weapon; and before the deputies reached the house, dispatch informed them that Plaintiff had departed the residence. [Doc. 44 ¶¶ 2-3; Doc. 50 p. 3-4] When Deputies Hill and Martin arrived at the Gurule's house, Mr. Gurule was standing in the doorway gesturing to the deputies, who followed him into the house. [Doc. 44 ¶¶ 6-7, Doc. 50 ¶¶ 2-3]

Once the deputies entered the residence Plaintiff, who was holding a baseball bat, yelled from a doorway across the room that he had a shotgun. [Doc. 44 ¶¶ 8, 12; Doc. 46 ¶ 33] Deputy Hill ordered Plaintiff to drop the weapon and show his hands. [Doc. 44 ¶ 9; Doc. 50 ¶ 5] Plaintiff did neither. [Doc. 44 ¶ 9; Doc. 50 ¶ 5] Instead, Plaintiff moved out of the doorway toward the deputies at which point Deputy Hill shot him twice. [Doc.

46 ¶ 34; Doc. 51 ¶ 38]  Only a few seconds passed between the moment that Plaintiff and the deputies first encountered each other and the moment that Deputy Hill shot Plaintiff. [Doc. 46 ¶ 36; Doc. 46-7 p. 27]  After Deputy Hill shot Plaintiff the deputies saw that Plaintiff possessed a bat, but no shotgun.  [Doc. 44 ¶ 13]  Plaintiff later pleaded no contest to the crime of aggravated assault arising out of his encounter with the deputies. [Doc. 44-7]

     Additional facts are provided, as necessary, in the context of the Court's discussion.

## DISCUSSION

### I.    The *Heck* Doctrine

Defendants seek summary judgment as to all of Plaintiff's claims based on the *Heck* doctrine.  [Doc. 44 p. 10-12]  Pursuant to *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), a plaintiff in a Section 1983 action may not "recover damages for alleged[] . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless the conviction has been reversed, expunged, or otherwise invalidated.  On the other hand, "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed[.]"  *Id.* at 487.  In some cases, the *Heck* doctrine bars an excessive force claim "in its entirely because the theory of the claim is inconsistent with the prior conviction."

*Havens v. Johnson*, 783 F.3d 776, 783 (10th Cir. 2015).  However, "[a]n excessive-force claim against an officer is not necessarily inconsistent with a conviction for

assaulting the officer.  For example, the claim may be that the officer used *too much* force

to respond to the assault[.]"  *Id.* at 782 (emphasis added).

Plaintiff pleaded no contest[1] to aggravated assault contrary to NMSA 1978, Section

30-3-2 (1963) arising out his confrontation with the deputies.  As stated in the pertinent

New Mexico jury instruction, the crime of aggravated assault under the circumstances of

this case consists of the following elements:  (1) the defendant engaged  threatening or

menacing conduct that (2) caused Deputy Hill person to believe that the Mr. Felts was

about to intrude on his bodily integrity or personal safety by touching or applying force to

him in a rude, insolent, or angry manner; (3) a reasonable person in the same

circumstances as Deputy Hill would have had the same belief; and (4) in so doing the Mr.

Felts used a baseball bat which, when used as a weapon, could cause death or great

bodily harm.  NMRA 14-305 UJI.

Plaintiff does not deny that he committed aggravated assault, nor could he reasonably

do so in light of his plea; and his claims in the present lawsuit are not built upon a theory

that he was innocent of any wrongdoing prior to being shot by Deputy Hill.  To the

contrary, Plaintiff's claims are premised on two theories:  one is that the use of deadly

force was excessive and unreasonable under the circumstances; and the second is that

Deputies Hill and Martin acted recklessly thereby creating the circumstances that led to

their confrontation with Plaintiff.  [Doc. 50 p. 19]  These theories, discussed in more

detail below, are not inconsistent with Plaintiff's plea, and they are not barred by the

---

[1] The *Heck* doctrine applies to pleas of guilty and of pleas of no contest alike; this is
because the doctrine "derives from the existence of a valid conviction, not the mechanism
by which the conviction was obtained[.]" *Havens*, 783 F.3d at 784.

*Heck* doctrine. *Havens*, 783 F.3d at 783 (recognizing that the *Heck* doctrine would not bar a claim that the officer responded to an assault with too much force). To the extent that Defendants' seek summary judgment on this ground, the Court denies the *Motion*.

## II.   Defendants' Assertion of Qualified Immunity on Behalf of Deputy Hill

Defendants argue that Deputy Hill is entitled to qualified immunity. [Doc. 44 p. 14-17] "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability[.]" *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004) (citation omitted). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015).

When a defendant asserts qualified immunity, "[t]he plaintiff bears the burden of establishing both (1) that the defendant violated a constitutional right and (2) that the right [was] clearly established by the time of the violation." *Id.* at 1164.

### 1.   The Constitutional Right

The Fourth Amendment guarantees citizens the right to be secure against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Thus, Fourth Amendment excessive force claims, like Plaintiff's claim against Deputy Hill, are governed by the standard of objective reasonableness, which is measured from the

perspective of a reasonable officer on the scene. *Tenorio*, 802 F.3d at 1164.

"The reasonableness of an officer's actions depends [upon] whether the officers were in danger at the precise moment that they used force and [upon] whether the officer's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Tenorio*, 802 F.3d at 1164 (alterations omitted).  While the Court makes this determination by examining the totality of the circumstances, specific factors informing the decision include (1) whether the plaintiff was ordered to drop his weapon, and whether he complied with officers' commands; (2) whether the plaintiff made any "hostile motions" toward the officers with the weapon; (3) the distance separating the plaintiff from the officers; and (4) the plaintiff's "manifest intentions[.]" *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1154 (10th Cir. 2010).  Whether the plaintiff was suspected of a crime, and if so, the severity of the crime; and whether he posed "an immediate threat to the safety of the officers or others" are also particularly relevant to the reasonableness determination. *King v. Hill*, 615 Fed.Appx. 470, 474 (10th Cir. 2015).

Prior to their arrival at the Gurules' residence, Deputies Hill and Martin had been informed by dispatch that Plaintiff might have been trying to "blow up the house" by turning on the gas; that that the family members whom he had held "hostage" had left the residence; that Mr. Gurule had returned home; and that Plaintiff, who had left the Gurules' residence on foot, might be trying to hurt himself.  [Doc. 48 ¶ A (dispatch recordings)]  Once the deputies arrived, Mr. Gurule went to his front door and beckoned them to enter his house. [Doc. 46-7 p. 23; Doc. 46-8 p. 9]  Without pausing to ask Mr.

Gurule any questions about what had occurred or what the circumstances inside the house were, and without pausing to discuss with each other how to proceed, the deputies followed Mr. Gurule into the house. [Doc. 61 ¶ 4, Doc. 61-2 p. 11; Doc. 50-4 p. 30] Mr. Gurule stated in deposition that he told the deputies before they went inside the house that Plaintiff had a bat, but that he was going to say that he had a shotgun; however, whether Mr. Gurule actually said this to the deputies disputed. [Doc. 61 ¶ 4; Doc. 61-5 p. 2; Doc. 61-2 p. 19]

When the deputies entered the house, Plaintiff appeared in the threshold of a doorway, across the room from the deputies, and announced that he had a shotgun. [Doc. 61-2 p. 17-18] The lighting in the room was either very dim (according to Deputy Hill) or very bright—with almost all of the lights in the house on (according to Mr. Gurule). [Doc. 50-4 p. 34; Doc. 50-1 p. 4] Deputy Hill began to give Plaintiff commands—such as "show me your hands" and "drop it." He gave this sort of command two or three times. [Doc. 61-2 p.18] When Deputy Hill gave the commands, Plaintiff was standing in the threshold of the living room door, with one hand hidden behind the doorjamb and his other hand—which was empty—at his side. [Doc. 61-2 p. 18; Doc. 61-1 p. 11] While it is undisputed that Plaintiff announced that he had a shotgun, a question of fact exists as to whether he raised the bat to his shoulder (as stated by Deputy Hill in a deposition); or whether he held the bat at his side without raising it (as stated by Deputy Martin in a deposition); or whether, owing to a broken arm, he was even capable of raising the bat (as stated by Mr. Gurule in a deposition). [Doc. 46-4 p. 5; 46-7 p. 27; 46-8 p.12] When Deputy Hill shot him, Plaintiff had moved out of the doorway and into the living room

toward the deputies; whether he merely stepped out of the doorway or whether he "charged" the deputies is disputed. [Doc. 46-7 p. 26-27; Doc. 50-1 p. 4; Doc 50-5 p. 14-15] However, the distance between the deputies and Plaintiff, though not specified in feet, was at least the length of a pool table; and, according to Deputy Martin, Plaintiff was "right by the door" when Deputy Hill shot him. [Doc. 46-8 p. 10]

As noted earlier, these circumstances must be viewed in their totality and in the light most favorable to Plaintiff. Beginning with the factors discussed in *Zia Trust Co.*, 597 F.3d at 1154, the Court concludes the following. It is undisputed that Plaintiff did not obey Deputy Hill's commands to show his hands or to "drop it." *See id.* (enumerating factors that are relevant to a reasonableness determination, including whether the plaintiff obeyed the officer's commands). However, the remaining three factors—namely, whether the plaintiff made any "hostile motions" toward the officers with the weapon; the distance separating Plaintiff from the officers; and Plaintiff's "manifest intentions" present genuine issues of fact. *See id.* (enumerating some factors relevant to the reasonableness determination). Viewed in the light most favorable to Plaintiff, a reasonable jury could reject Deputy Hill's testimony that Plaintiff raised the bat, which Deputy Hill thought was a gun, in favor of Deputy Martin's testimony that Plaintiff held the bat at his side, or in favor or Mr. Gurule's testimony that Plaintiff was incapable of raising the bat because he had a broken arm. A reasonable jury could also resolve the issue of whether Plaintiff "charged" the deputies or merely took a step out of the doorway in favor of Plaintiff.

Viewing these interrelated facts in the light most favorable to Plaintiff, a jury

9

could find the totality of the circumstances to include the following. When the deputies entered the house they had been advised by Mr. Gurule that Plaintiff, who was inside the house, had a bat, but that he was going to say that it was a shotgun. The room was well lit permitting the deputies to see for themselves, had they taken the time or care to do so, that Plaintiff was holding a bat instead of a shotgun. While holding the bat at his side, Plaintiff took one step out of the doorway. Although Plaintiff was still across the room, separated from the deputies by the length of a pool table, Deputy Hill shot him. These facts, viewed in the context of the dispatch report that Plaintiff might be trying to hurt himself, that his family had left the Gurule residence without being harmed, and that Mr. Gurule, having returned to the residence was unharmed, support an inference that Plaintiff's "manifest intentions" involved self-harm, but no threat of harm to others.

As noted earlier, other relevant factors include whether Plaintiff was suspected of a crime, and whether he posed an immediate threat to the officers. *King*, 615 Fed.Appx. at 474. Viewing the evidence in the light most favorable to Plaintiff, the deputies both testified that they did not go to the Gurule residence to arrest Plaintiff for a crime; rather, their primary purpose was to ensure that Plaintiff and Mr. Gurule were okay, and unharmed. [Doc. 50-4 p. 27; Doc. 50-5 p. 7] Further, although Plaintiff was later charged for crimes arising from his confrontation with the deputies, he was not charged with any crime relating to his behavior prior to their arrival at the Gurule residence. [Doc. 51 p. 3] Thus, a jury could conclude that the deputies did not immediately suspect Plaintiff of a crime. And, as indicated in the Court's discussion of facts in the preceding paragraph, the issue whether Plaintiff posed an "immediate threat" to the officers requires

10

factual determinations regarding Plaintiff's actions, Deputy Hill's knowledge of Plaintiff's "shotgun" ruse, the lighting and distance between them, and other considerations. Resolution of material facts such as these is the purview of a jury at trial, not the Court in summary judgment proceedings. *Daniels*, 701 F.3d at 627.

Finally, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the deputies' own reckless conduct unreasonably created the need to use force in this situation. *See Tenorio*, 802 F.3d at 1164 (stating that the officers' reckless or deliberate conduct is a factor contributing to the reasonableness analysis). The deputies arrived at the Gurule residence in separate cars, having not communicated with each other via phone or radio about how to proceed once they got there. [Doc. 61-2 p. 8; Doc. 50-4 p. 23; Doc. 50-5 p. 7] After their arrival, still without communicating about how to proceed, the deputies went from their cars to the house with Deputy Hill in the lead and Deputy Martin following. [Doc. 50-5 p. 8; Doc. 50-5 p. 7-8] Without attempting to interview Mr. Gurule as to what the circumstances were inside the house or what had occurred prior to their arrival, the deputies followed him immediately into the house. [Doc. 61-1 p. 9; Doc. 61-2 p. 6, 10-11; Doc. 50-5 p. 9] These actions did not comport with the deputies' training or Sheriff Burkhard's expectations of how deputies should respond to a call, nor did they accord with the manner in which Deputy Hill normally conducted himself in response to a domestic dispute dispatch. [Doc. 50-7 p. 14-15, 21; Doc. 50-5 p. 9; Doc. 50-4 p. 21-22] Further, owing to the deputies' hurried entrance into the house and lack of communication, Deputy Martin, who was familiar with Plaintiff and had a good rapport with him and with Mr. Gurule, did not share her

pertinent experience or insight with Deputy Hill.  [Doc. 50-5 p.5, 7]  A reasonable jury could find that the deputies demonstrated recklessness in their failure to communicate with each other as to how to proceed, and their failure to communicate with Mr. Gurule as to what had occurred and was occurring before they entered the house.  From these facts a reasonable jury could infer that Deputy Hill's "need" to use force against Plaintiff was, at least in part, precipitated by the reckless manner in which Deputies Hill and Martin entered the Gurule residence.

In sum, genuine issues of material fact exist as to whether Deputy Hill was in danger at the precise moment that he shot Plaintiff and as to whether the deputies' own reckless conduct unreasonably created the "need" for him to shoot Plaintiff.  *See Tenorio*, 802 F.3d at 1164 (stating the standard by which reasonableness is measured in the context of use of force).  These issues of fact, if resolved in favor of Plaintiff, could support a conclusion that it was not reasonable under the circumstances for Deputy Hill to shoot Plaintiff in the face and in the shoulder; and, by extension, that Plaintiff was subjected to excessive force in violation of his Fourth Amendment rights.

### 2.  Whether the Right Was Clearly Established

"For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Pauly v. White*, 814 F.3d 1060, 1075 (10th Cir. 2016).  This inquiry does not require a case directly on point; rather, the Court considers whether, taken in the light of the specific context of the case, a general constitutional rule applies "with obvious clarity to the specific conduct in question." *Id.*  At the same time, the Court must avoid

12

analyzing the "clearly established law at too high a level of generality." Quinn v. Young, 780 F.3d 998, 1011 (10th Cir. 2015).

Broadly speaking, the right to be free from excessive force is, and has long been, well established in our Tenth Circuit. *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). In the specific context of this case, there are two principles that apply to Deputy Hill's particular conduct. The first principle is that where an officer is confronted by a person who holding a deadly weapon (other than a gun) at a distance, and the person is not making any threatening motions toward the officer with the weapon, it is not reasonable to use deadly force against him. *See id.* (discussing a circumstance in which an officer confronted a person holding a knife); *see also Tenorio*, 802 F.3d at 1166 (holding that summary judgment on qualified immunity grounds was not warranted where an officer shot a person who was holding a knife, but was not within striking distance of the officer); *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989) (holding that summary judgment on qualified immunity grounds was not warranted where an officer shot a person who was holding fingernail clippers that the officer believed to be a knife). Although this principle applies most frequently in the context of a person holding a knife or other sharp object, the Court concludes that it may be extrapolated to this circumstance in which a Plaintiff was holding a bat—which, like a knife, is most effectively used as a weapon when one's opponent is within the object's reach. *See Hernandez ex rel. Estate of Medrano v. Frias*, No. CIV 10-0351 JB/LAM, 2011 WL 1127882, at *18 (D.N.M. March. 15, 2011) (denying summary judgment on qualified immunity grounds where officers shot and killed a person who was armed with

13

a baseball bat and a knife, but who was not "clear[ly] . . . capable of causing immediate serious harm to the officers").

The second principle is that an officer may not by his own recklessness precipitate the need to use deadly force by, for example, "confront[ing] an armed and suicidal/emotionally disturbed individual without gaining additional information[.]" *Hastings v. Barnes*, 252 Fed.Appx. 197, 206 (10th Cir. 2007); *see Allen v. Muskogee, Okla.*, 119 F.3d 837, 841 (10th Cir. 1997) (reversing summary judgment in favor of defendants as to the plaintiff's excessive force claim where questions of fact existed as to whether the officers' actions were reckless and precipitated the need to use deadly force); *Murphy v. Bitsoih*, 320 F.Supp.2d 1174, 1193 (D.N.M. 2004) ("Clearly established law in this Circuit . . . holds that an officer is responsible for his or her reckless conduct that precipitates the need to use force.").

Insofar as these principles were vested in our Tenth Circuit jurisprudence during the relevant time frame, and based on a view of the facts taken in the light most favorable to Plaintiff, the Court concludes that the prohibition against deadly force in these circumstances was clearly established. Accordingly, Deputy Hill is not entitled to qualified immunity as to Plaintiff's excessive force claim.

## III.   Plaintiff's Motion for Summary Judgment on His Excessive Force Claim

Plaintiff seeks summary judgment on his excessive force claim. [Doc. 46 p. 8-15] In considering Plaintiff's argument, the Court must examine the facts discussed in the preceding section—there in the light most favorable to Plaintiff— anew, this time viewing them in the light most favorable to Defendants.

Viewing the facts in the light most favorable to his excessive force claim Plaintiff's argument is, summarily, that he was in the throes of a mental health crisis, "trying to commit suicide by cop" when Deputies Hill and Martin arrived at the Gurules' house. [Doc. 46 p. 10-11] Mr. Gurule told the deputies that Plaintiff had a bat that he was going to claim was a shotgun and, although the deputies "knew or should have known that" they had been called "to assist an individual in mental health crisis," Deputy Hill acted recklessly by entering the house without a plan and without any information and "abruptly encountered and shot [Plaintiff] within seconds." [Doc. 46 p. 11-13] While this is one view of the facts, a reasonable jury might also find that Deputies Hill and Martin, having been advised by dispatch that Plaintiff had left the Gurules' residence, reasonably believed that Mr. Gurule was alone in the house. A jury might also find that Mr. Gurule did not tell the deputies that Plaintiff had a bat that he was going to say was a shotgun, and that upon entering the house and being confronted by Plaintiff, Deputy Hill reasonably believed that Plaintiff was holding a shotgun. The Jury could find, further, that Plaintiff "charged" the deputies with the bat raised. Under these circumstances, Deputy Hill could reasonably have concluded that Plaintiff posed an immediate threat and was acting with the manifest intention of harming the deputies.

Further, as to Plaintiff's theory that the deputies' recklessness precipitated the encounter and led to Deputy Hill's use of force, when viewed in the light most favorable to Defendants, the evidence could reasonably support a conclusion in favor of Defendants. For example, a reasonable jury could conclude that based on the information from dispatch that Plaintiff had left the Gurule residence, the deputies reasonably

believed that Plaintiff was not inside the house when they arrived. [Doc. 46-7 p. p. 16] Further, insofar as Deputy Hill testified in a deposition that he believed that it was safer, and less likely to lead to a confrontation with Plaintiff, for the deputies to enter the house instead of staying outside where Plaintiff, who was possibly armed, could "discharge" "something" at them, a reasonable jury could conclude that the deputies decision to enter the house was precipitated by a desire to *avoid* a confrontation with Plaintiff. [Doc. 46-7 p. 16-17] A jury could also find that Deputy Hill believed—as he testified in a deposition—that Mr. Gurule was "frantically waving" for the deputies to go inside the house because he needed help turning of the gas, and that this belief was reasonable of itself and that it formed a reasonable basis for Deputy Hill to enter the house without delay. [Doc. 46-7 p. 16] Under these circumstances, a reasonable jury could find that the deputies did not recklessly precipitate a confrontation with Plaintiff.

Because the facts, viewed in the light most favorable to Defendants, could support a conclusion that Deputy Hill's use of force was reasonable, and that the confrontation that led to the use of force was not precipitated by recklessness on the part of the deputies, Plaintiff is not entitled to summary judgment on his excessive force claim.

## IV.    Plaintiff's State Law Claims

In the *Complaint*, Plaintiff stated tort claims against Deputy Hill and Sheriff Burkhard. [Doc. 12 ¶¶ 66-71] Against Deputy Hill, Plaintiff stated claims of assault, battery, and false arrest. [Doc. 12 ¶¶67, 71] And against Sheriff Burkhard, Plaintiff stated a claim of negligent hiring, training, and supervision. [Doc. 12 ¶¶ 70-71] In their present *Motion*, Defendants seek summary judgment as to Plaintiff's tort claims against

Deputy Hill.  [Doc. 44 p. 20-23]

As to the claim of false arrest, Plaintiff concedes that judgment as a matter of law in favor of Defendants is appropriate on the ground that Defendant ultimately pleaded no contest to the crime of aggravated assault arising out of his confrontation with the deputies.  [Doc. 44 p. 23; see Doc. 50 p. 32-34]  Thus, the Court focuses on Plaintiff's claims of assault and battery against Deputy Hill.

Pursuant to the New Mexico Tort Claims Act a public employee is not immune from liability for "any tort alleged to have been committed by the public employee while acting within the scope of his duty;" or for any violation of any rights secured by the constitution of the United States alleged to have been committed in the scope of his duty. NMSA 1978, § 41-4-4(B) (2001).  Defendants concede that Deputy Hill was a public employee acting within the scope of his duty when he took the actions that underlay Plaintiff's assault and battery tort claims.  [Doc. 44 p. 22]  However, they argue that Deputy Hill's actions, which they claim were reasonable and therefore lawful, do not give rise to a tort claim.  The Court is not persuaded by this argument

As an initial matter, Defendants' argument regarding the lawfulness of Deputy Hill's use of force is built upon the assumption that that Deputy Hill's use of force was reasonable as a matter of law.  [see Doc. 44 p. 22-23]  The Court, having concluded that genuine issues of fact exist as to the reasonableness of the use of force, rejects this assumption.  *See Pena*, 108 F.Supp 3d at 1048 ("An officer can be held liable for assault and battery if he uses excessive force.").

Moreover, the Court does not accept Defendants' implicit assertion that the standard

of "reasonableness" in the Fourth Amendment context accords with the standard of reasonableness in a common law tort context. "The Fourth Amendment's 'reasonableness' standard and the standard of 'reasonable care' under tort law are not the same. An officer may fail to exercise 'reasonable care' as a matter of state tort law yet still act reasonably in the federal constitutional sense." *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002). This is because "[t]he United States Constitutional and traditional tort law do not address the same concerns." *Long*, 508 F.3d at 580 (alterations omitted). Therefore, even assuming that Deputy Hill's use of force was "reasonable" under the Fourth Amendment; it would not necessarily be "reasonable" under state tort law. For the foregoing reasons, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's assault and battery claims.

## V.      Plaintiff's Supervisory Liability Claims

Plaintiff claims, pursuant to § 1983, that Sheriff Burkhard in both his individual and his official capacities is liable for Deputy Hill's allegedly excessive use of force. Plaintiff's supervisory liability claims are premised on the theory that Deputy Hill's use of excessive force was caused by Sheriff Burkhard's failure to adequately train his deputies, or to establish policies and procedures for them to follow, in regard to interacting with mentally ill or suicidal individuals. [Doc. 50 p. 29-32] Both parties have moved for summary judgment as to these claims. [Doc. 44 p.18; Doc. 46 p. 16]

The Court begins by considering the evidence in the light most favorable to Plaintiff on Defendants' *Motion for Summary Judgment*. "[I]n a § 1983 lawsuit, supervisory

18

liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements, a policy  which subjects or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (alterations omitted). "This does not equate to liability under a theory of respondeat superior." *Id.*  "A plaintiff arguing for the imposition of supervisory liability . . . must show an affirmative link between the supervisor and the constitutional violation." *Id.*

"The requisite showing of an affirmative link between a supervisor and the alleged constitutional injury has . . . three related prongs: (1) personal involvement, (2) sufficient causal connection, and (3) [a] culpable state of mind." *Id.*  Thus, a plaintiff is required to show "that each defendant acted with the constitutionally requisite state of mind by identifying specific policies over which particular defendants possessed supervisory responsibility that violated their clearly established constitutional rights." *Id.* at 1249 (alteration omitted).

## 1.  Plaintiff's Claim Against Sheriff Burkhard in His Individual Capacity

"At bottom, when confronting individual-capacity § 1983 claims, our focus must always be on the *defendant*—on the injury *he* inflicted or caused to be inflicted, and on *his* motives. This is because § 1983 [is not] a strict liability offense." *Id.* at 1254. Thus, in the context of this case, the focus is whether the evidence, viewed in the light most favorable to Plaintiff, demonstrates that Sheriff Burkhard, acting with deliberate indifference, deprived or caused Plaintiff to be deprived of his constitutional rights. *See id.* (recognizing that deliberate indifference is the requisite mental state in a § 1983

19

supervisory liability claim).   Even when it is viewed in the light most favorable to Plaintiff, the evidence does not satisfy the foregoing requirements.

It is undisputed that Sheriff Burkhard was neither present when Deputy Hill shot Plaintiff, nor directly involved in dispatching, planning, or executing the deputies' actions at the Gurules' house.   [Doc. 46-10 p. 12-13; Doc. 50-7 p. 16-19]   Insofar as Sheriff Burkhard had no knowledge of or involvement in the events at issue, he cannot be found to have been deliberately indifferent to the risk that Deputy Hill would use excessive force against Plaintiff.   *See id.* at 1250 (stating that in order for a sheriff to have acted with deliberate indifference, he needed to first have knowledge of a specific risk to the particular person whose constitutional rights were in jeopardy).   Under these circumstances, Defendants are entitled to summary judgment as to Plaintiff's supervisory liability claim against Sheriff Burkhard in his individual capacity.

## 2.   Plaintiff's Claims Against Sheriff Burkhard in his Official Capacity

Official capacity claims represent "another way of pleading an action against an entity of which an officer is an agent." *Id.* at 1254.   The focal point of a supervisory liability claim against a person acting in his official capacity is the overarching policy making and policy-implementation decisions made by the official as a cause of the plaintiff's constitutional deprivation.   *Id.* at 1255.   Where, as here, the claim rests on a failure-to-train theory, the plaintiff must demonstrate that, "in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton,*

20

*Ohio v. Harris*, 489 U.S. 378, 390 (1989).

To prevail in a § 1983 claim on a theory of inadequate training of police officers in the use of force, a plaintiff must show that:

> (1) The officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen*, 119 F.3d at 841-42. For ease of reference, the Court refers to the foregoing as the "*Allen* factors."

As explained in the Court's earlier discussion, there is evidence to support Plaintiff's excessive force claim, and thus the first *Allen* factor is satisfied here. Further, it is undisputed that interactions with mentally ill and suicidal persons is a common and recurring circumstances in police work, generally, including in Valencia County. [Doc. 46 ¶ 43; Doc. 46-7 p. 6, 8; Doc. 46-10 p. 8; see Doc 51 ¶ 43] Thus, the second *Allen* factor is also satisfied.

As to the third *Allen* factor—deliberate indifference, our Tenth Circuit has held that

> [t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a *narrow* range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a

municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (emphasis added).   A plaintiff seeking to establish deliberate indifference must do more than "merely enumerate[] the multiple ways in which . . . the [o]fficers were inadequately trained[;]" rather, he must proffer "evidence of knowledge of the purported deficiencies on the part of the" municipality. *Id.*  Nor is it sufficient that a plaintiff "merely assert that the [municipality] failed to train"; rather, he must also "show that the need for training was obvious to the" municipality. *Id.*

There is no evidence proffered in this case of a "pattern of constitutional violations."   As such, the Court considers whether the evidence, viewed in the light most favorable to Plaintiff, shows that it was "highly predictable or plainly obvious" to Sheriff Burkhard that his deputies required more or better training in regard to handling mentally ill/suicidal persons in order to curtail the "obvious potential" use of excessive force.  In this regard, the evidence does not reasonably support Plaintiff's claim against Sheriff Burkhard in his official capacity.  Plaintiff attempts to satisfy this factor by pointing to the fact that although Sheriff Burkhard "recognized that interactions with mentally ill citizens is a common and recurring issue in Valencia County and in all policing," he "acknowledges [that] Valencia County has no standard operating procedures (SOP's) that direct his deputies in encounters with persons that are known to be mentally ill[.]" [Doc. 46 p. 16] Plaintiff's argument, while technically true, is a skewed misrepresentation of Sheriff Burkhard's deposition testimony.

22

While Sheriff Burkhard acknowledged that that "mental health is not separately addressed in [his] SOP's," he also testified that the deputies receive 40 hours of crisis management training in the police academy, and that Valencia County provided and required an additional four hours of training (double that which is required by the state) on "dealing with mentally impaired" individuals. [Doc. 46-10 p. 7] Thus, this proffered evidence suggests that Sheriff Burkhard knew that in performing their duties his deputies would encounter mentally ill and suicidal individuals, but he also knew that they received training on this matter at the police academy, and he implemented a requirement that his deputies take additional training in that regard—exceeding the minimum required by state law. Defendants' expert, Jack Ryan, whose deposition testimony on this matter is included among Plaintiff's evidence in support of his Motion for Summary Judgment, testified that the training that Sheriff Burkhard's deputies receive in regard to dealing with the mentally ill is far more extensive (almost ten times the hours) than that received by the vast majority of local law enforcement agencies in the country (out of 15,000 law enforcement agencies, only 1500 at most provide this amount of training). [Doc. 46-12 p. 2-3]

Plaintiff's argument implies, but does not show, that notwithstanding their training, the absence of SOP's rendered the deputies so inadequately prepared to encounter mentally ill/suicidal individuals that that Sheriff Burkhard can be said to have ignored the obvious potential for his deputies to use excessive force in those circumstances. However, based on the facts in the record, no reasonable jury could conclude that Sheriff Burkhard was "deliberately indifferent" to the need for his deputies

to be trained in dealing with mentally ill/suicidal individuals.  To conclude otherwise would be to entertain an obvious fiction, and the Court declines to do so.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that while the Court is required to view the evidence in the light most favorable to Plaintiff in considering Defendants' Motion for Summary Judgment, the Court is precluded from relying upon "visible fiction[s]" in order to entertain Plaintiff's version of the facts).

To the extent that Plaintiff's supervisory liability claim against Sheriff Burkhard in his official capacity relies, further, on the particular actions and failures of Deputies Hill and Martin after they were dispatched to the Gurules' residence, it is to no avail.  [Doc. 46 p. 17-18]  As stated by the Supreme Court in *City of Canton*,

> [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . .  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable.

*City of Canton*, 489 U.S. at 390-91 (citations omitted).  Thus, as a matter of law, Plaintiff cannot rely on the particular actions or failures of the Deputies Hill and Martin during their encounter with Plaintiff to impute liability to Sheriff Burkhard in his official capacity.

For the foregoing reasons, Defendants are entitled to summary judgment as to

Plaintiff's claim against Sheriff Burkhard in his official capacity.  As such, the Court denies Plaintiff's *Motion for Summary Judgment* as to that claim.  [Doc. 46 p. 16]

## VI.   Plaintiff's ADA Claim

Defendants seek summary judgment as to Plaintiff's ADA claim against Valencia County and Sheriff Burkhard in his official capacity.  Plaintiff's claim in this regard relies on a theory that the municipality is vicariously liable for actions taken by Deputies Hill and Martin which, Plaintiff claims, violated his rights as an American with a disability.   [Doc. 46 p. 19-22]    Whether vicarious liability is appropriate in this circumstance is not an issue raised by the parties.   Therefore, for the purpose of considering Plaintiff's claim, the Court assumes that Plaintiff's vicarious liability theory is viable.  *See Doe v. Bd. of Cty. Comm'rs of Craig Cty.*, No. 11-CV-0298-CVE-PJC, 2011 WL 6740285, *2 (N.D. Okla. Dec. 22, 2011) (collecting cases to demonstrate that although "the Tenth Circuit has not explicitly addressed the issue of *respondeat superior* liability under Title II of the ADA, other circuits that have considered the question have unanimously held that a municipal employer is vicariously liable for the acts of its employees who violate Title II of the ADA"); *see also City & Cty of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1773-74 (2015) ("Only public entities are subject to Title II [of the ADA], and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees. But we have never decided whether that is correct, and we decline to do so here[.]").

Title II of the ADA, pursuant to which Plaintiff makes his claim, provides that "no qualified individual with a disability shall, by reason of such disability be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). "To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Id.*

In the arrest and investigation context, federal courts have addressed ADA claims based on two general theories. The first is a circumstance in which "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999). "The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at 1220-21. However, Courts have distinguished between circumstances in which a disabled person, through no fault of his own, suffers discriminatory treatment at the hands of law enforcement personnel from circumstances in which an officer uses force in responding to a disabled person's unlawful and threatening behavior. The former is actionable under the ADA, the latter is not. *See id.* at 1221-22 (holding that an officer's use of force against a disabled person who was engaged in unlawful behavior that the officer perceived as a threat was not actionable under the ADA); *Hainze v. Richards*, 207 F.3d 795, 801 (5th

Cir. 2000) (holding that an officer's use of force against disabled person was not actionable under the ADA where the officer used force because of the disabled person's assault of him with a deadly weapon, not because of the person's disability); *Thompson v. Williamson Cty, Tenn.*, 219 F.3d 555, 558 (6th Cir. 2000) (same).

In the present case, Plaintiff pleaded no contest to the crime of aggravated assault arising from his encounter with deputies Hill and Martin. [Doc. 44-7] Because Deputy Hill's used force in response to Plaintiff's unlawful assault, and not in response to lawful action caused by Plaintiff's disability, Plaintiff cannot prevail in his ADA claim. *See Gohier*, 186 F.3d at 1221-22; *Hainze*, 207 F.3d at 801; *Thompson*, 219 F.3d at 558. Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiff's ADA claim; and the Court denies Plaintiff's *Motion for Summary Judgment* on his ADA claim. [Doc. 46-19]

**VII.   Damages**

In his § 1983 claim against Deputy Hill for the alleged use of excessive force, Plaintiff claims that he is entitled to punitive damages. [Doc. 12 ¶ 50] Defendants seek a summary judgment determination that Plaintiff is not entitled to punitive damages on the ground that there is no evidence that Deputy Hill acted with an "evil motive or intent, or" that he was "reckless[ly] or callous[ly] indifferen[t]" to Plaintiff's federally protected rights. [Doc. 44 p. 23] *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) ("Punitive damages are available in § 1983 actions . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."). As discussed earlier, an issue of

fact exists as to whether Deputy Hill acted recklessly in his encounter with Plaintiff. This issue precludes summary judgment on the matter of punitive damages. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (holding "that a jury may be permitted to asses punitive damages in an action under § 1983 . . . when the underlying standard of liability for compensatory damages is recklessness").

Defendants also argue that, as a matter of law, Plaintiff is not entitled to recover any damages for "lost earning capacity." [Doc. 44 p. 24] In support of this claim, Defendants point to the undisputed fact that Plaintiff has never held a full time job, and he is not claiming damages for lost income. [Id.] Defendants provide no authority to support the proposition that these facts are dispositive of the issue whether Plaintiff may seek damages for lost income. As such, they have failed to satisfy their initial burden of demonstrating an absence of material fact on the issue of lost earning capacity. Summary judgment is not warranted as to this aspect of Plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 330-31 (recognizing that the summary judgment movant has the initial burden of making a prima facie showing that it is entitled to summary judgment).

**CONCLUSION**

For the reasons stated herein, the Court **GRANTS** *Defendants' Motion for Summary Judgment and Brief in Support* [Doc. 44] as it pertains to Plaintiff's ADA claim, and Plaintiff's supervisory liability claims against Sheriff Burkhard in his individual and official capacities; in all other respects, Defendants' *Motion* is **DENIED**. The Court **DENIES** *Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support* [Doc. 46].

**IT IS SO ORDERED** this  23rd   day of September,  2016 in Albuquerque, New

Mexico.

M. CHRISTINA ARMIJO
**Chief United States District Judge**